STATE of Minnesota, Respondent,

v.

Michael Charles STEWART, Appellant.

No. C6–00–234.

Supreme Court of Minnesota.

April 19, 2001.

Chad Michael Oldfather, Assistant State Public Defender, Minneapolis, for Appellant.

Mark Nathan Lystig, Assistant Ramsey County Attorney, Mike Hatch, Minnesota Attorney General, St. Paul, for Respondent.

OPINION

STRINGER, Justice.

Appellant Michael Charles Stewart was indicted and tried in Ramsey County District Court on counts of first- and second-degree murder for the killings of Amanda Carlson–Bey, Carlson–Bey's unborn child, and the two-year old son of appellant and Carlson–Bey, Jereau Carlson. At trial appellant testified that he killed Carlson–Bey and Jereau in a fit of rage after Carlson–Bey disclosed that she was HIV-positive. The trial court granted appellant's request for a jury instruction on first-degree manslaughter (heat of passion) with respect to the deaths of Carlson–Bey and her unborn child, but denied the same request with respect to Jereau, concluding that under Minn.Stat. § 609.20 the heat-of-passion element was not transferable from the provocateur to a third person. The jury acquitted appellant on counts of first- and second-degree murder of Carlson–Bey and the unborn child but found him guilty of first-degree manslaughter (heat of passion) of Carlson–Bey and the unborn child. The jury also found appellant guilty of first- and second-degree murder of Jereau. Appellant now appeals his first-degree murder conviction contending that the trial court erred in refusing to instruct the jury on first-degree manslaughter (heat of passion) as to the killing of Jereau. We affirm the conviction but on different grounds.

Appellant and Carlson–Bey were sexually intimate from approximately October 1995 to January 1996. When Carlson–Bey tested positive for the HIV virus in February 1996 she named appellant as a person with whom she had had sexual contact. A Minnesota Department of Health official notified appellant in April 1996 that he had been exposed to someone who tested positive for HIV. According to the health official, appellant was "a bit shocked about the exposure but said that he would deal with it as best he [could]." Appellant subsequently tested negative for HIV, although it is unclear from the record precisely when he was tested. He testified at trial that he intended to have the HIV test the next day after meeting with the health official but he also told police on the day of the murders that he was tested for HIV "a year ago," a date several months after learning of his potential exposure. At trial he claimed that his statement to the police referred to a 1997 test for chlamydia that he believed was a test for sexually transmitted disease in general. The record is clear however, that appellant did test negative for HIV and that he did not have sex with Carlson–Bey after that time. The assistant medical examiner confirmed that Carlson–Bey was HIV-positive at the time of her death.

About a year after Jereau was born on August 4, 1996, Carlson–Bey initiated a proceeding to establish paternity and alleged that appellant was the father. A blood test later indicated that appellant was a presumed father. In a judicial proceeding on May 7, 1998 appellant was adjudged Jereau's father and was ordered to pay child support in the amount of $337 per month. Appellant told his girlfriend that he did not mind paying the child support payment but he thought it was high and that he had found a second job to earn enough to compensate for his child support obligations. He later asked child support officials if he could lower the payment partly because he believed that his payment was being used to support Carlson–Bey's new boyfriend. A friend of Carlson–Bey testified that Carlson–Bey told her that appellant was upset at having to pay child support for a child he only recently learned was his. Appellant also told his girlfriend that he was embarrassed by Jereau because Carlson–Bey was white and appellant is black.

Carlson–Bey moved to Chicago with Jereau in June 1998 but returned to St. Paul in October 1998 to visit her mother, Roberta Carlson. Carlson–Bey was pregnant at the time. Appellant testified that Carlson–Bey called him from her mother's apartment approximately two weeks be-

fore October 21, 1998 and, after missing one scheduled appointment, he agreed to visit Carlson–Bey and Jereau on October 21 after he got off work. Appellant arrived at the apartment around 9:00 a.m. and played with Jereau. While he sat on the couch with Jereau watching television, Carlson–Bey, who was seated next to him in a chair, told him that she was either HIV-positive or had AIDS. Appellant testified that he jumped up and hit Carlson–Bey in the face. Carlson–Bey yelled something like "What are you doing?," ran into the kitchen and returned with a knife. Appellant testified that he wrestled the knife from Carlson–Bey, then threw her into the chair and stabbed her repeatedly. Appellant testified that "I just lost it. Rage, I guess. * * * I tried to be a good person. I worked my whole life just to be a good person, to help a lot of people. And then someone tells me I have AIDS, or HIV, and, again, it just blew me—blew me—I can't explain this rage, the emotions."

After stabbing Carlson–Bey, appellant picked up Jereau, put him on the sofa, put his hand over Jereau's mouth and stabbed him repeatedly. Appellant testified that he does not remember stabbing Jereau but he told the police and his girlfriend that he put his hand over Jereau's mouth to keep him from crying and told the police he feared Jereau's crying would attract people. After the killings appellant stated that he put the knife in the pouch pocket of his sweatshirt, went down the stairs to his car and threw the knife into a garbage can. The unborn child died from oxygen deprivation as a consequence of Carlson–Bey's death.

The jury trial proceeded in two phases. The first phase related to whether appellant committed the crimes for which he was charged and the second phased related to whether a mental illness or mental deficiency relieved appellant of criminal responsibility. At the end of the first phase appellant requested that the judge instruct the jury to consider first-degree manslaughter (heat of passion) with respect to the death of all three victims. The trial court granted appellant's request with respect to the death of Carlson–Bey and the unborn child but ruled that appellant was not entitled to a heat-of-passion jury instruction relating to the killing of Jereau:

> While there * * * appears to be no case law on this specific topic in Minnesota, the court is persuaded by cases in other jurisdictions which indicate that there is no transference of the heat-of-passion element from the person who provokes the assailant to a third party who is not involved in the provocation. And for that reason the court believes that a Manslaughter instruction is not appropriate with respect to Jereau * * *.

The jury acquitted appellant on counts of first- and second-degree murder for the killing of Carlson–Bey and the unborn child but convicted him of first-degree manslaughter (heat of passion) of Carlson–Bey and the unborn child and first- and second-degree murder of Jereau.[1]

Appellant contends that the trial court erred in denying the requested instruction because Minn.Stat. § 609.20 allows a crime committed against a third party not involved in the provocation to be committed in a heat of passion. We review the issue de novo as a question of law. *State v. Murphy,* 545 N.W.2d 909, 914 (Minn.1996).

Minnesota Statutes § 609.20 provides:

> Whoever does any of the following is guilty of manslaughter in the first degree * * *: (1) intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances, provided that the crying of a

---

1. The jury found at the end of the second phase that appellant was not relieved of crim-

inal responsibility because of mental illness or deficiency.

child does not constitute provocation * * *.

The state would construe "another" in the phrase "such words or acts of another" to mean only the victim. Appellant contends that the term "another" plainly includes persons other than the victim and that, if the meaning is not plain, "another" should be so construed because the primary concern in first-degree manslaughter (heat of passion) is not who provoked the heat of passion but whether the assailant acted under the influence of extreme emotional distress. In support appellant cites at length our decision in *State v. Boyce*, where we focused on the emotional status of the defendant in determining whether a homicide is murder or manslaughter in the first degree. 284 Minn. 242, 254–55, 170 N.W.2d 104, 112 (1969).

We construe the word "another" according to its common and approved usage unless it is defined in statute or has acquired a special meaning. Minn.Stat. § 645.08(1) (2000). "Another" is not defined in the manslaughter statute or elsewhere in the Criminal Code,[2] but the term is used in the first-degree murder statute to distinguish an intended victim from the person the defendant is accused of killing. Minn.Stat. § 609.185(1) (2000) (stating that a person is guilty of first-degree murder who "[c]auses the death of a human being with premeditation and with intent to effect the death of the person or of another * * *.") "Another" commonly signifies a person "different or distinct from the one first named or considered." Webster's Third New International Dictionary 89 (1976).

The fundamental question we must resolve is whether the legislature intended that the "another person" in reference to the victim and the "another" in reference to the provocateur must be the same person. The plain wording of the statute suggests that the legislature did not intend them to be the same person. If it did, the reference to the second "another"—the provocateur—would have been "the other person," or some other words clearly establishing that the provocateur and the victim must be the same person. Failing to do so, and using the term "another" in referring to the provocateur, we are led to the conclusion that they may be different persons.

The statutory history of the adoption of section 609.20 leads to the same conclusion. The statute was adopted in 1963 as part of the revised criminal code soon after the American Law Institute adopted the *Model Penal Code.* Act of Aug. 1, 1963, ch. 753, art. 1, 1963 Minn. Laws 1185, 1200 (codified at Minn.Stat. § 609.20). The *Model Penal Code* provided that criminal homicide constituted manslaughter when the murder was committed "under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse * * * determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be." Model Penal Code, § 210.3 (1980). A comment on section 609.20 by the Advisory Committee on Revision of the Criminal Law referred with approval to the focus of the *Model Penal Code* on the extreme mental state of the assailant rather than on who provoked the assailant, with respect to the heat-of-passion manslaughter charge. Advisory Committee on Revision of the Criminal Law, Proposed Minnesota Criminal Code, § 609.20, comment (1962).[3] The history of section 609.20 thus further supports our conclusion that the victim and the provo-

---

2. The "property of another" is defined in section 609.556, for the purposes of damage and trespass to property, to mean "a building or other property * * * in which a person other than the accused has an interest * * *." Minn.Stat. § 609.556, subd. 2 (2000).

3. We recognized the importance of the defendant's mental state in *Boyce.* 284 Minn. at 254–55, 170 N.W.2d at 112. "[I]t is the emotional status of the defendant which is of primary importance in determining whether a homicide is murder or manslaughter in the first degree."

cateur need not be the same person and that the mitigating consequences of heat of passion, provoked by one party, may be transferred to assaultive conduct toward someone other than the provocateur.[4]

While we conclude that section 609.20 permits the transference of heat of passion from a provocateur to a victim who is not a provocateur, our inquiry does not end there, as we must determine if it was error for the trial court to deny a heat-of-passion instruction with respect to the killing of Jereau.

■ An instruction on a lesser-included offense should be given when the offense in question is an included offense and a rational basis exists for the jury to convict the defendant of the lesser-included offense and acquit the defendant of the greater crime. *State v. Brocks*, 587 N.W.2d 37, 40 (Minn.1998). First-degree manslaughter is a lesser-included offense of first-degree murder. *Id.* at 41. The issue then is whether as a matter of law a rational basis exists for a jury to convict appellant of first-degree manslaughter with respect to the killing of Jereau and acquit him of first- or second-degree murder. *See State v. Griffin*, 518 N.W.2d 1, 3 (Minn.1994) ("The issue for us, an appellate court * * * is the legal issue of whether defendant's testimony was so unworthy of belief that no rational jury would be entitled to believe it.").

■ Appellant's intentional killing of Jereau may be mitigated to first-degree manslaughter if (1) the killing was committed in the heat of passion; and (2) the passion was provoked by such words or acts of another as would provoke a person of ordinary self-control under the circumstances. *Brocks*, 587 N.W.2d at 41. The first element is subjective and the second element is objective. *State v. Buchanan*, 431 N.W.2d 542, 549 (Minn.1988).

■ While the person whose conduct provokes an assailant's heat of passion may be someone other than the victim, a heat of passion that provokes an assailant to kill the provocateur will not necessarily satisfy the subjective or objective elements of heat-of-passion manslaughter as to other victims. The evidence as to whether the assailant killed the victim in the heat of passion and the factors that support a conclusion that a person of ordinary self-control would have been provoked under the same circumstances to kill the provocateur may differ and may not be sufficient to support the same conclusion with respect to another. Therefore the two-part test for manslaughter is applied separately as to the killing of each victim.

■■ We conduct an independent review of the record as a whole to determine whether a rational basis exists for a jury to conclude that appellant killed Jereau in the heat of passion and whether there were words or acts sufficient to provoke a person of ordinary self-control to act as appellant did. *Brocks*, 587 N.W.2d at 41. As to the subjective element, we look for a heat of passion that "clouds a defendant's 'reason and weaken[s] his willpower.'" *Id.* (quoting *Boyce*, 284 Minn. at 254, 170 N.W.2d at 112). Anger alone is not heat of passion. *Brocks*, 587 N.W.2d at 41.

■ Our inquiry into whether appellant killed Jereau in the heat of passion begins with the observation that appellant's testimony demonstrates that he did not have a close emotional attachment to Jereau. He visited Jereau only two or three times before Carlson–Bey and Jereau moved to Chicago and missed two scheduled appointments to see them after they returned to Minneapolis. A friend of Carlson–Bey's testified that Carlson–Bey told her that appellant was upset at having to pay child support for a child he only recently learned was his. Appellant testified that he did not mind paying child support but he told his girlfriend that he thought the payment was high and took a second

---

4. We also note that the transfer of intent to kill another human being is a recognized doctrine in our criminal code. *See State v. Ford*, 539 N.W.2d 214, 229 (Minn.1995).

job to compensate for his child support obligations. Appellant's girlfriend testified that appellant was embarrassed by Jereau because appellant is black and Carlson-Bey was white.

As to where the evidence of the actual killing leads regarding appellant's claim of heat of passion, he remembers lifting Jereau onto the sofa after he killed Carlson-Bey but does not remember stabbing him. He told his girlfriend however, that after he killed Carlson-Bey he saw Jereau crying and put his hand over Jereau's mouth and stabbed him. Appellant also told the police that Jereau was crying loudly and that he stabbed Jereau because he was worried Jereau's crying would attract the attention of others. Appellant testified that after he killed Jereau he put the knife into his sweatshirt pocket, went to his car, put the knife into a bag and threw the bag into a garbage can.

Appellant's admissions as to why and how he killed Jereau and his conduct after the killings have none of the characteristics of the outrage and loss of self-control that we associate with the heat of passion—they do not demonstrate the clouded reason or weakened willpower we referenced in *Boyce*. What they do demonstrate is an assailant—in a rational, calculating and controlled emotional state of mind—attempting to avoid detection for the crime he just committed. Based on this record, we conclude as a matter of law that there is no rational basis for a jury to find that appellant killed Jereau in the heat of passion. Because we reach this conclusion, there is no need to inquire into whether heat of passion was reasonably provoked.

We hold that while the trial court erred in ruling that there is no transference of heat of passion from the provocateur to a third-party victim who is not a provocateur, it did not err in denying appellant a jury instruction on manslaughter in the

first degree (heat of passion) with respect to the killing of Jereau.

Affirmed.