**STATE of Minnesota, Respondent,**

v.

**Mark John CARNEY, Appellant.**

No. C5–01–977.

Supreme Court of Minnesota.

Aug. 22, 2002.

Roy George Spurbeck, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Natalie E. Hudson, Assistant Attorney General, St. Paul, MN, Lisa Nelson Borgen, Clay County Attorney, Moorhead, MN, for Respondent.

## OPINION

STRINGER, J.

Mark John Carney (appellant) was convicted of premeditated first-degree murder for killing John Voeller (Voeller) after confirming that Voeller was having an affair with appellant's wife Sheila Carney. At trial appellant requested a jury instruction on the lesser-included offense of first-degree heat-of-passion manslaughter under Minn.Stat. § 609.20(1) (2000). The district court denied the request and the jury found appellant guilty of first-degree premeditated murder. On direct appeal appellant seeks a new trial based on claimed error in denying his request for a heat-of-passion manslaughter jury instruction as well as two evidentiary rulings. We affirm.

Appellant and his wife Sheila were married in 1983 and over the next few years they had two sons. In 1999, appellant became depressed over his career and matters relating to home renovations and repairs, and, although he changed jobs, his depression persisted. He took antidepressants for a short time but stopped due to negative side effects. In January of 2000, through Sheila's job with Stop–n–Go

stores, a close working relationship developed between Sheila and Voeller as they worked together to open Tobacco City stores. Over the next several months Sheila and Voeller became confidants spending at least 800 minutes a month talking to one another on their cell phones in May and June. A mutual attraction developed, although when appellant asked Sheila about her relationship with Voeller, she told him it was work-related and that "nothing was going on."

In May, two days after Sheila met friends at a bar and did not return home that night, appellant called her and threatened suicide. He began taking antidepressants again and he and Sheila attended family counseling sessions. Sheila continued to insist that her relationship with Voeller was work-related and not an issue. She and appellant decided to live separately but they stayed together three or four times a week and were frequently intimate.

One night in late June appellant and Sheila met at a bar and had several drinks. They agreed that appellant would follow Sheila as she drove home in her car because of her alcohol consumption. While driving Sheila called Voeller on her cell phone. When they arrived home, appellant pressed redial on Sheila's cell phone and saw that she had called Voeller. An argument ensued, Sheila reiterated that her relationship with Voeller was not an issue, and she then left for her mother's house with their younger son. Appellant was distraught and again threatened suicide. After talking with his family he checked himself into a clinic for psychiatric evaluation but stayed only until the next day. Shortly thereafter, at a mental health professional's suggestion, appellant moved his firearms to his aunt and uncle's home, forgetting two at home. Appellant's aunt described his behavior in July as

erratic. She said that he had trouble sleeping and concentrating, he was not eating, and he was sluggish. Meanwhile Sheila continued to tell appellant's family that her relationship with Voeller was not an issue.

Appellant arrived at Sheila's office after lunch one day in July and saw Sheila getting out of Voeller's car. Appellant told Voeller to stay out of his marriage and poked Voeller in the chest. Voeller laughed off the comment. In August, another confrontation occurred when Sheila had not invited appellant to her company picnic, an event he had attended for the prior 20 years. He became upset and appeared anyway, and after the picnic had ended, he found Sheila and Voeller alone in the parking lot, talking near their cars. When Sheila saw appellant she drove away immediately. Voeller got in his car and when approached by appellant, Voeller asked him "[W]hat are you doing now fat boy?" Appellant punched Voeller in the face through the open window, Voeller got out of his car and the two scuffled.

Although Sheila continued to deny she was having an affair with Voeller, appellant often followed her, showed up unannounced at her office, and called her numerous times during the day demanding to know where she was, whom she was with and where she was going. On several occasions appellant took Sheila's cell phone and waited for Voeller to call. Sheila considered this behavior, as well as appellant's suicide threats, as controlling and manipulative.

Appellant telephoned Voeller's wife in August and was told that she did not know what their spouses were doing and that if Sheila and Voeller wanted to be together, appellant should move on. Later appellant told a friend that appellant could not be happy with Voeller around, told his boss something like he wanted to "beat the hell

out of" Voeller, and wrote his wife a note instructing her to not come back "until there is no such thing as [Voeller]."

On August 13 appellant and Sheila had dinner with appellant's aunt and uncle to talk about the future of appellant and Sheila's marriage. Appellant's aunt was concerned that Sheila was giving appellant a false hope that their marriage could succeed. Three days later appellant's spirits were lifted because he and Sheila were intimate that morning, they later had lunch, he sent her flowers and appellant scheduled a job interview. Despite these positive signs however, later that day appellant purchased equipment at an electronics store to enable him to record telephone conversations and he installed the machine that day at the family home where Sheila was staying. Appellant testified that he bought the equipment to confirm what Sheila and his family told him: that the affair was "in his head."

That night the machine recorded a conversation between Sheila and Voeller in which Voeller referred to appellant as "shit for brains," and they discussed a variety of subjects, including a bet between them as to whether appellant would come home that night. Most important however, they discussed Sheila and Voeller's plans to go away for the coming weekend. Voeller described how he had bought liquor for the trip that made Sheila "crazy" and joked that appellant had probably tapped the phones. The machine also recorded a call from appellant to Sheila while she and Voeller were talking and recorded Sheila's click over to call waiting to speak with appellant. He told her he had called to say goodnight and to tell her about the group therapy he had attended that night. Sheila quickly ended the conversation:

Sheila: All right. I'll talk to you later.

Appellant: I love you.

Sheila: Bye.

Appellant: I'd like to hear it back from you.

Sheila: Goodbye, I said.

Appellant: Goodbye.

Sheila resumed her conversation with Voeller on the other line and ended it affectionately:

Sheila: All right. Love you.

Voeller: Love you too.

Sheila: Bye.

Appellant drove to their home and retrieved the tape the next morning after Sheila left for work. He listened to it in his truck as he drove to work, but when he arrived at work at about 8 a.m. he couldn't stay because he was "crushed." He testified that the tape had confirmed his worst fear and that his "world was gone." He called his aunt and uncle and drove to his uncle's place of work at about 8:30. Appellant's uncle described his driving as erratic, and he was crying when he arrived. His uncle described him as "devastated," an "emotional nightmare," an "emotional train wreck," and "emotionally uncontrollable." Appellant told his uncle that the tape confirmed that Sheila was having an affair. He made several statements about harming himself and thought that since Sheila and Voeller joked about the phone being tapped they were trying to make him kill himself or drive him crazy. He played parts of the tape for his uncle, including the part where Sheila and Voeller exchanged "love" messages. Appellant agreed he would stop listening to the tape but refused to give it to his uncle. His uncle told him to take the tape to an attorney.

After leaving his uncle, appellant drove to Moorhead continuing to listen to the tape. He called his mother about the tape and said he wanted to kill himself. He then drove to his parents' home to try to

work on his resume for the job interview but could not focus and soon left. Appellant testified that he picked up one of his shotguns from his uncle's home, planning to drive to Sheila's office, play the tape for her, and then kill himself with the gun. He drove home, sawed off the barrel of the gun and its stock and butt so he could conceal it when entering Sheila's office, and wrote a note to his sons: "Justin & Logan, No matter what happens today, always remember I love you very much. Love Dad." He armed himself with five shotgun shells and picked up a tape player so he could play the tape for Sheila.

Appellant testified that upon arriving at Sheila's place of work in south Fargo he did not have the courage to go inside. He called a Tobacco City store asking to talk with Voeller to learn of his weekend plans but was informed that Voeller was not at that location. Soon after he called Sheila to ask her the same question and she told him that she was going to Minneapolis with her friend Karen. Appellant described driving to his office while crying, shaking and a "wreck," changing direction and heading toward his parents' lake home in Minnesota. He testified that he drove to Moorhead and stopped for gas at the Stop–n–Go store that was connected to a Tobacco City store that appellant knew Voeller managed. Appellant testified that he saw Voeller's car and without stopping to buy gas, as originally planned, he parked in a gravel lot along the side of the store—a location out of the sight of those in the store. Appellant then walked in to confront Voeller with the gun and ammunition in his jacket.

Voeller's back was turned when appellant walked in. Appellant said "I'm sorry" and turned around.[1] Appellant testified that when Voeller responded "Yeah, you should be," appellant "snapped," shooting Voeller once in the back of the head. With Voeller slumped to the floor, facing upward, appellant moved a few steps closer, said "that's for sleeping with my wife," reloaded the shotgun and shot Voeller in the face. He then left the store. Appellant testified that his memory of the events was hazy and he did not remember ejecting a shell or cocking the gun's hammer.

A witness outside the store saw appellant turn his back to Voeller the first time, turn back toward Voeller, raise the gun and fire. The witness called 911 and when the police arrived they pursued appellant in his truck. A high-speed chase wound through town terminating at appellant's house where he drove across the lawn and came to a stop in a wooded area. Appellant refused to get out of the truck when police approached. As they talked with him he vacillated between turning himself over to authorities and "not wanting to go to prison"—comments the police interpreted as suicide threats. To appellant's question whether anyone was hurt, police responded they did not know for sure. Appellant said he believed Voeller was dead based on his hunting experience and knowledge of guns. Appellant finally agreed to turn himself in about two hours later; police found the shotgun in the cab of appellant's truck, loaded and cocked. Appellant never expressed remorse.

At the close of testimony, appellant requested that the jury be instructed on the lesser-included offense of first-degree

---

1. Appellant's motion to strike an inference drawn in the state's brief that appellant turned his back "probably to load his gun" is denied as it was only an inference and was not unreasonable. Also denied is appellant's motion to strike an allegation in the state's brief that appellant called Voeller's wife two weeks prior to the shooting to ascertain Voeller's work schedule. Voeller's wife testified that she did not recall an inquiry about her husband's schedule.

heat-of-passion manslaughter. The district court denied the motion, ruling that the jury did not have a rational basis to convict on manslaughter and acquit on premeditated murder because the evidence did not support appellant's claim that the killing occurred in the heat of passion. The court cited appellant's suspicion of the relationship between Voeller and Sheila as evidenced by the roses Voeller sent Sheila, extended cell phone conversations between them, appellant's habit of checking Sheila's cell phone to see if Voeller called, the two physical confrontations between appellant and Voeller, appellant's expressions of jealousy and rage about Voeller to others, and the note appellant wrote to Sheila that concluded "don't come back unless there is no such thing as [Voeller]."

The district court also noted that on the morning of the killing appellant listened to the tape, drove around extensively, talked to his uncle, went to his parents' house to work on his resume, drove to his uncle's house to pick up the shotgun, drove home and modified the shotgun, picked up shotgun shells, wrote a note to his sons, called a Tobacco City store looking for Voeller, drove to the Tobacco City store, parked not by the gas pumps but out of sight of the windows, walked in and told the victim he was sorry—all before shooting the victim in the back of the head, reloading and shooting again. The court observed that the events of the day took place over two hours, and that Voeller's reply "Yeah, you should be sorry" did not, in light of appellant's actions that day, support his claim that the crime took place in the heat of passion.

The district court also ruled that Voeller's response to appellant's apology did not rise to the level of something that would provoke a person of ordinary self-control in similar circumstances. The court instructed the jury only on premedi-

tated first-degree murder and intentional second-degree murder.

During deliberations, the jury sent the following question to the court:

> If [appellant] walked into the tobacco store with intentions to kill John Voeller and while in the store he changed his mind and turned to walk out of the store, whereas John Voeller made a comment that would make [appellant] snap and turn to shoot John Voeller, would that premeditation be gone from this equation?

The court's response was to tell the jury to refer to the instructions already given. The jury then found appellant guilty of first-degree premeditated murder.

Appellant asserts that the district court erred in refusing to give the heat-of-passion manslaughter instruction, and that combined with two evidentiary rulings, he was deprived of his right to a fair trial.

## I.

▪ We address first appellant's claim that the district court erred in denying his request for a jury instruction on a lesser-included offense of heat-of-passion manslaughter. The lesser-included offense instruction must be given if a reasonable basis exists for the jury to convict the defendant of the lesser-included offense and to acquit on the greater offense. *State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975).

Heat-of-passion manslaughter in the first degree is defined in Section 609.20(1): whoever "intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances" is guilty of manslaughter in the first degree. The court was required to give the instruction if the evidence provided a rational basis for

the jury to find that (1) appellant actually killed Voeller in the heat of passion; and (2) appellant's passion was provoked by words or acts that would provoke a person of ordinary self-control under similar circumstances. *See State v. Brocks,* 587 N.W.2d 37, 41 (Minn.1998).

■ The first element of the heat-of-passion defense is subjective: whether the killing was actually committed in the heat of passion. *State v. Buchanan,* 431 N.W.2d 542, 549 (Minn.1988). The defendant's emotional state at the time of the killing is of primary importance in making this determination. *State v. Boyce,* 284 Minn. 242, 254–55, 170 N.W.2d 104, 112 (1969). In determining whether the district court erred in denying the instruction we look for a heat of passion that clouds a defendant's reason and weakens his willpower. *Id.* at 254, 170 N.W.2d at 112. Anger alone is not enough. *Brocks,* 587 N.W.2d at 41. A defendant's behavior before, during and after the crime is relevant to whether the crime was committed in the heat of passion. *See State v. Stewart,* 624 N.W.2d 585, 591 (Minn.2001).

In *State v. Stewart,* the defendant admitted that he put his hand over the child victim's mouth while he stabbed him because he was worried that the child's crying would attract attention. *Id.* He also admitted that after the killing he hid the knife in his clothing, drove away, put the knife in a bag, and threw the bag in a garbage can. *Id.* We concluded that Stewart's admissions as to why and how he killed the victim and his conduct after the killings had "none of the characteristics of the outrage and loss of self-control that we associate with the heat of passion—they do not demonstrate the clouded reason or weakened · willpower we referenced in *Boyce.*" *Stewart,* 624 N.W.2d at 591. We held that the defendant's actions demonstrated a rational, calculating and con-

trolled emotional state of mind rather than the characteristics associated with heat of passion. *Id.*

Here appellant contends that the preceding months of emotional strain and the intense emotional stress from the confirmation of Sheila's affair with Voeller clouded his reason and hobbled his will power, and it was in this state of mind that he shot Voeller. He argues that he was provoked by the discovery of the affair, had not cooled off when he approached Voeller, and "snapped" when Voeller told him he "should be sorry." He cites testimony that he was an emotional "train wreck," was crying and shaking all morning as he listened to the taped conversation, and that his hazy recollection of the shooting is consistent with the heat of passion in *State v. Shannon,* 514 N.W.2d 790, 793 (Minn. 1994). In *Shannon,* we held that the defendant's hazy memory of the killing supported the submission of a heat-of-passion manslaughter instruction to the jury. In *Shannon* however, the passion arose when the defendant and the victim began arguing just prior to the killing and the dispute escalated to a physical altercation between the victim and the defendant, as evinced by scratch marks on the defendant's body. *Id.* The progression of events leading to the crime were measured in moments rather than hours, as here.

The state responds that while the facts show that appellant may have been very upset once he heard the tape, he was still making choices and acting upon them when he committed the crime. It argues that appellant's claim that he did not know of the affair until August 17 is "hairsplitting" because appellant's actions in the months and weeks preceding the shooting—for example, appellant's controlling behavior toward Sheila and his physical confrontations with Voeller—demonstrate appellant's strong suspicion of Sheila and

Voeller's affair and the tape merely confirmed this.

■ After a careful and thorough review of the record we conclude that the district court did not err in ruling that the evidence did not provide a rational basis for the jury to conclude that appellant killed Voeller in the heat of passion and acquit on the first-degree murder charge. The evidence was clear that appellant was aware and suspicious of Sheila's close relationship with Voeller for months, he expressed feelings of jealousy and anger to friends and coworkers about Voeller, and physically confronted Voeller on two occasions. Appellant was suspicious enough to install recording equipment on their family phone the day before the shooting—even on the same day his spirits were lifted by their intimacy.

During the approximately two hours that passed between the time appellant first listened to the recording and the shooting, appellant listened to the tape repeatedly, had conversations with his mother and uncle, and drove around the Fargo–Moorhead area stopping at his and Sheila's workplace, his uncle's workplace, and the homes of his parents and uncle. He attempted to work on his resume; he retrieved and altered a shotgun to enable him to hide it in his jacket and armed himself with five shotgun shells. He wrote a note to his sons and telephoned Sheila and asked her about her weekend without revealing what he learned on the tape. He called a Tobacco City store and asked for Voeller, then drove to another Tobacco City store and parked out of view of the people in the store. Finally, appellant walked in to the store and shot Voeller in the head, reloaded and shot him again.

While appellant's conduct over the two hours leading up to the shooting does demonstrate some characteristics of desperation—for instance his crying and driving erratically from place to place—there is also a pervading characteristic of anger, vengeful planning, and preparation. Appellant sawed off a shotgun in order to hide it in his jacket and armed himself with *five* shotgun shells—belying his claim that his intended use of the sawed-off shotgun was to commit suicide in Sheila's presence. He wrote a note to his sons, he telephoned Tobacco City stores looking for Voeller, after he shot Voeller he told him "that's for sleeping with my wife," and he then reloaded and shot Voeller again. Appellant refused to turn himself into police, said he "didn't want to go to prison" and expressed no remorse for the killing. The district court thoroughly reviewed the evidence leading to its conclusion that there was no rational basis for the jury to find that appellant killed Voeller in the heat of passion. We agree.

Because we determine that the district court did not err in ruling that the evidence did not provide a rational basis for the jury to find that appellant killed Voeller in the heat of passion, the first element, we need not address the second element—whether Voeller's words or acts would have provoked a person of ordinary self-control under like circumstances. Minn. Stat. 609.20(1). We note however, that we agree with the district court's ruling that Voeller's response to appellant's apology—"Yeah, you should be sorry"—could not rationally provoke a person of ordinary self-control to kill. It was not threatening, nor was it disparaging, and while it may have had a cynical tone, that is hardly sufficient to justify appellant's violent and deadly response.[2]

2. The question posed by the jury to the court during deliberation does not support appellant's claim that the heat-of-passion instruction should have been given. The question

## II.

■ The second issue raised by appellant is whether two evidentiary rulings combined to deny him a fair trial. Rulings on evidence will not be overturned absent a clear abuse of discretion. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). Appellant bears the burden of showing both the error and resulting prejudice. *See State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn. 1994). Appellant alleges the district court erred in (1) admitting a photograph of the victim with his family over a defense objection; and (2) sustaining the state's objection to witness testimony that would have described the contents of a videotape showing Voeller and Sheila hugging.

■ As to the photograph, appellant argues that its admission into evidence was an improper appeal to the sympathy, passion and prejudice of the jury. The state responds that it may properly introduce evidence concerning the life of a homicide victim and the photograph is relevant and admissible to show the "spark of life" and to present the victim as a human being (citing *State v. Graham,* 371 N.W.2d 204, 207 (Minn.1985) (holding that even though victim's personal life was not strictly relevant to issue of who murdered him, the prosecution had some leeway to show the victim was imbued with spark of life and to present the victim as a human being)). The photograph fell within the prosecutor's latitude in showing Voeller as a human being and was not unduly prejudicial, as Voeller's wife testified that he was married with three children. That Voeller had a surviving wife and children was therefore already before the jury. Accordingly we hold that the district court's ruling to admit the photograph was not an abuse of discretion.

Evidence of the videotape, appellant argues, should have been admitted to "round out" Voeller's character, just as the family photo was admitted, and that the testimony was relevant to show that Sheila had lied to appellant about the affair. The state argues that the testimony was inadmissible hearsay, a violation of the best evidence rule, irrelevant, and cumulative.

■ It was uncontroverted at trial that Sheila and Voeller were having an affair and that she lied to appellant about it— therefore the evidence was cumulative. Further its admission would have violated the "best evidence" rule, as the videotape itself is the best evidence of its contents. *See* Minnesota Rule of Evidence 1002. We hold that the district court did not abuse its discretion in excluding the testimony and appellant's right to a fair trial was not violated by the court's evidentiary rulings.

Affirmed.

MEYER, J., took no part in the consideration or decision of this case.

---

related to whether appellant would have premeditated Voeller's killing if Voeller's comment "Yeah, you should be sorry," at a time when appellant had abandoned his plan to kill Voeller, caused appellant to "snap" and shoot him. The jury's guilty verdict for premeditated first-degree murder suggests it did not believe appellant's assertion that he did not premeditate Voeller's murder when he pulled the trigger.