STATE of Minnesota, Respondent,

v.

Steven VAN KEUREN, Appellant.

No. A07–1842.

Supreme Court of Minnesota.

Dec. 18, 2008.

Lawrence Hammerling, Chief State Appellate Public Defender, G. Tony Atwal, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN; and Doug Johnson, Washington County Attorney, Stillwater, MN, for respondent.

## OPINION

PAGE, Justice.

On June 27, 2007, a Washington County jury found appellant Steven Van Keuren guilty of two counts of first-degree premeditated murder for the shooting deaths of his ex-girlfriend, Teri Lynn Lee, and her boyfriend, Timothy Hawkinson, Sr. The district court sentenced Van Keuren to two consecutive terms of life imprisonment without the possibility of release. In this direct appeal, Van Keuren argues that: (1) the district court erred when it failed to give the jury a first-degree manslaughter instruction; (2) the prosecutor committed misconduct when he argued that Van Keuren tailored his testimony to fit the evidence; (3) the district court erred when it denied his change-of-venue motion; and (4) his conviction must be reversed and the indictment dismissed because an unauthorized person, an assistant county attorney, framed his indictment before the grand jury. We affirm.

Van Keuren and Lee met in 1998 and began dating in late 2002. According to Van Keuren, he grew close to Lee and her four children over the next three and a half years. Van Keuren testified that, in July of 2006, he and Lee went shopping for wedding rings and that Lee set July 27, 2007, as their wedding date. Later that month, however, Lee informed Van Keuren that she no longer wanted to see him. Van Keuren became depressed and had trouble eating and sleeping. Devastated by the break-up, Van Keuren forced his way into Lee's house near the end of July, and he was charged with assault and burglary. As a condition of his release pending trial, Van Keuren was ordered to have no contact with Lee. Van Keuren also lost his job because of those charges. At some point during the summer of 2006, Lee began dating Hawkinson.

On September 21, 2006, Van Keuren went to his father's house and took a .22 caliber gun from a bedroom. At 3:36 a.m. on September 22, he left a voicemail message for B.M., a friend and former co-worker, stating in part,

I want to take Teri's life and my life because she doesn't deserve to live.... I was thinking about doing this about a week earlier when you came into my [life] to talk to me and stuff like that, and pushed it back and pushed it back and now I'm finally at the straw and stuff.

Van Keuren testified that after leaving the message, he drove to his father's house to deliver a package containing his identification cards, two suicide notes, and instructions for disposing of his property. The notes stated, in part, "I had it with her[;] now she wants to take the Vikings ticket away from me and also told all my freinds [sic] that I will be going away for a long time and I can't do it!" Van Keuren further testified that while driving to his father's house he decided not to kill Lee because he remembered that B.M. had children, and he did not want Lee's children to go without a mother. Van Keuren left the package in his father's mailbox and drove to Lee's house where, according to his testimony, he intended to kill himself in front of Lee. Upon arriving at Lee's house, Van Keuren parked in a neighbor's driveway, cut Lee's telephone and cable lines, and, carrying the gun from his father's house and 12 rounds of ammunition, entered Lee's house by breaking the glass in the basement door with a crowbar. Once inside, Van Keuren crept upstairs to the master bedroom where he found Hawkinson, Lee, and Lee's oldest daughter sleeping. Lee's other three children were sleeping in their rooms down the hall.

Van Keuren testified that immediately after entering the bedroom, he used the

gun to shoot himself in the neck twice. Then, while struggling with Hawkinson, Van Keuren tried to shoot himself again, but the bullet accidentally struck Hawkinson. At some point, Hawkinson fell to the ground, and Van Keuren noticed the gun was empty. Van Keuren reloaded the gun in order to shoot himself in front of Lee when, according to Van Keuren, Lee told him that she had miscarried with their child and that he would never have any children. Van Keuren testified that hearing this from Lee made him mad and frustrated, so he shot Lee twice and then sprayed bullets around the room.

Lee's oldest daughter testified that she saw Van Keuren shoot her mother before she fled the room. The daughter and her sister subsequently fled to a neighbor's house where they called the police. After Van Keuren ran out of bullets, he took a box cutter from a bathroom and cut both his and Lee's wrists so they could be "blood brothers" and die together. Van Keuren also called his father to tell him what had happened and to apologize. His father called the police. When the police arrived, they first secured Lee's two sons who were hiding in their bedroom. They proceeded to the master bedroom where they found Van Keuren pointing a gun at the door. After refusing to drop the gun, Van Keuren was shot three times.

The police found ten spent cartridge casings and two unspent casings in the room where the shooting took place. The medical examiner testified that both Lee and Hawkinson died of multiple gunshot wounds, Hawkinson having been shot three times and Lee six times. In 2007, a jury found Van Keuren guilty of two counts of first-degree murder and, upon conviction, he was sentenced to two consecutive life sentences without the possibility of release.

I.

 We first address Van Keuren's argument that the district court erred by denying his request to have the jury instructed on the lesser-included offense of first-degree manslaughter. In this case, the district court instructed the jury on first-degree premeditated murder and second-degree murder, but not on first-degree heat-of-passion manslaughter under Minn.Stat. § 609.20(1) (2006). We review a district court's denial of a lesser-included offense instruction for abuse of discretion. *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn.2005). When a defendant requests a lesser-included offense instruction, the district court must give the instruction if the lesser offense is included in the charged offense and if the evidence provides a rational basis to both acquit the defendant of the charged offense and convict the defendant of the lesser-included offense. *Id.* at 598; *see also* Minn.Stat. § 609.04, subd. 1 (2006). When deciding whether to instruct the jury on a lesser-included offense, the court is not permitted to weigh the evidence or make credibility determinations; instead, the court must view the evidence in the light most favorable to the party requesting the instruction. *Dahlin*, 695 N.W.2d at 598. The court must also view the evidence as a whole. *State v. Griffin*, 518 N.W.2d 1, 3 (Minn.1994). If, on review, we conclude that the district court abused its discretion by failing to give a requested lesser-included offense instruction, we will reverse the verdict only if the denial resulted in prejudice to the defendant. *Dahlin*, 695 N.W.2d at 599.

 We have held that first-degree heat-of-passion manslaughter is a lesser-included offense of first-degree premeditated murder. *State v. Hannon*, 703 N.W.2d 498, 509 (Minn.2005). The elements of first-degree manslaughter are:

(1) the killing must be in the heat of passion; and (2) the provocation for the passion must be such that would have been sufficient to provoke a person of ordinary self-control under like circumstances. *Stiles v. State,* 664 N.W.2d 315, 322 (Minn. 2003); Minn.Stat. § 609.20(1). "The defendant's emotional state at the time of the killing is of primary importance" in determining whether the killing occurred in the heat of passion. *State v. Carney,* 649 N.W.2d 455, 461 (Minn.2002). Heat of passion must "cloud[ ] a defendant's reason and weaken[ ] his willpower." *Id.; see also Hannon,* 703 N.W.2d at 510. We look to the defendant's emotional state because the legislature created heat of passion to mitigate culpability for a killing when the defendant behaves as a reasonable person would behave. *See State v. Auchampach,* 540 N.W.2d 808, 817–18 (Minn.1995) ("the existence of heat of passion is a mitigating circumstance"). However, anger alone is not enough to support heat of passion. *Hannon,* 703 N.W.2d at 510 (citing *State v. Stewart,* 624 N.W.2d 585, 590 (Minn.2001)).

■ According to Van Keuren, the evidence establishes that the killing of Hawkinson was a classic case of heat-of-passion manslaughter because of Van Keuren's unexpected discovery of the woman he loved in bed with another man. On that basis alone, Van Keuren claims that the district court was required to give a heat-of-passion manslaughter instruction. Van Keuren does not claim that any other evidence in the record supports his heat-of-passion claim with respect to the killing of Hawkinson. Nor have we identified any other evidence in the record that would suggest such a claim. Van Keuren contends that he was entitled to the instruction with respect to Lee's killing because she provoked his passion when she told him that she had miscarried and that he would never have children.

On the record before us, we conclude that the district court's refusal to give the first-degree manslaughter instruction did not constitute error because no evidence was produced that would support acquitting Van Keuren of the first-degree murder charge and convicting him of the lesser-included offense of first-degree manslaughter for either the death of Hawkinson or Lee. Our conclusion is driven by our reasoning in *State v. Hannon.* In *Hannon,* the defendant was convicted of first-degree premeditated murder for the beating death of his girlfriend. 703 N.W.2d at 502. We explained that when viewed in a light most favorable to Hannon, the evidence reflected "that partway through Hannon's assault of [his girlfriend] she told him she had AIDS, and that this statement *angered* Hannon." *Id.* at 511 (emphasis added). We further explained that:

> Although the testimony of [two witnesses] establishes that Hannon was angered by [his girlfriend]'s statement that she had AIDS, no evidence was adduced to demonstrate that [his girlfriend]'s statement served to cloud Hannon's reason or weaken his willpower beyond the emotional state he was in as he was assaulting [his girlfriend] before the comment about AIDS. Under our case law, "anger alone" does not create a basis for concluding that a killing occurred in the heat of passion.

*Id.* (citing *Stewart,* 624 N.W.2d at 590). In other words, we concluded that Hannon was not entitled to a heat-of-passion jury instruction because he had only established that he was angered, which was insufficient to establish the subjective element of a first-degree manslaughter crime—that his reason was clouded and his willpower weakened. *Id.* Further, in indicating that "no evidence was adduced to demonstrate that [his girlfriend]'s state-

ment served to cloud Hannon's reason or weaken his willpower beyond the emotional state he was in as he was assaulting [his girlfriend] before the comment about AIDS," we suggested that Hannon had failed, on the record presented, to establish the objective element of the crime—that there was sufficient provocation for the claimed passion. *Id.* Thus, we held that the district court did not err in refusing Hannon's request for a heat-of-passion manslaughter instruction. *Id.*

In this case, viewed, as we must, in the light most favorable to Van Keuren, the evidence indicates that when Van Keuren broke into Lee's house, he was angry with her and wished to traumatize her by killing himself in her presence. Although the evidence also indicates that Van Keuren discovered Hawkinson and Lee together in bed and that Lee told Van Keuren that she had miscarried their child and that he would never have children, no evidence was adduced to demonstrate that the events in the bedroom served to cloud Van Keuren's reason or weaken his willpower beyond the angry, emotional state he was in when he broke into Lee's house. Van Keuren did not testify that he killed Hawkinson and Lee because the events in the bedroom clouded his reason or weakened his willpower. Rather, Van Keuren testified that, upon discovering Hawkinson and Lee in bed together, he simply moved forward with his plan to shoot himself in Lee's presence. He further testified that he killed Hawkinson by accident during a struggle for the gun and that he killed Lee because she made him "very mad and frustrated." We conclude, as in *Carney*, 649 N.W.2d at 462, that the available evidence shows "a pervading characteristic of anger, vengeful planning, and preparation," but

no evidence of heat of passion. Given the evidence in the record, we further conclude that there is no rational basis for the jury to have found that Van Keuren acted in a heat of passion.[1] Based on that conclusion, we also conclude that there was insufficient evidence adduced at trial to warrant instructing the jury on first-degree manslaughter and that the district court did not abuse its discretion when it declined to give such an instruction.

## II.

Next, we address Van Keuren's claim that the State improperly argued during closing that Van Keuren tailored his trial testimony to fit the evidence. Van Keuren specifically complains about the following three paragraphs in the State's closing argument:

But now let's just think about this conversation. Hawkinson is now shot, "accidentally." The Defendant moves over and he's talking with Teri Lee, and now she's kicking sand in his face about this child. *Well, maybe when the Defendant told you that[,] he forgot about something-because back on the 22nd of September, when he was up in that bedroom, he wasn't thinking to himself, you know, there's going to come a time in June of 2007 when I'm going to have to talk to a jury in Washington County, and I'm going to have to tell them what happened here.* He wasn't thinking about that because he didn't think he was going to live.

. . . .

... What [the Defendant] did is he went back and said, well, I brought the snips because of this, and I brought the crowbar because of that, or the crowbar had already been in the car or some-

---

1. We question, but do not decide here, whether any murder defendant, in any case in which the killing takes place in violation of a court's no-contact order, may obtain the benefit of a mitigating heat-of-passion instruction.

thing, and so on and so forth. In other words, *explaining all the things that he was aware of couldn't be avoided because they were factual evidence, and going back and simply trying to explain them away for a very simple reason. If he doesn't explain them away, he's looking at being convicted of first degree murder.*

Now, the one piece of evidence that he has a difficult time explaining away is his telephone call to [B.M.] when he says what he's going to do. And the explanation for that is, "I changed my mind." And when you think about whether to believe that or not, think about the fact that ... [the Defendant has] been ruminating about this [plan] for a long time. He's been thinking about doing it for a long time. And all of a sudden, when he's got the crowbar, the gun, the ammunition, the snips, everything, when he's driving over there, all of a sudden he changes his mind[?].

(Emphasis added.) Van Keuren did not object to these statements at trial.

■■■ We review claims of unobjected-to prosecutorial misconduct for plain error. *State v. Ramey,* · 721 N.W.2d 294, 299 (Minn.2006). To establish plain error, an appellant must show: (1) that there was error; (2) which was plain; and (3) which affected the appellant's substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). If these three prongs are met, we then assess whether we should address the error to ensure fairness and the integrity of the judicial proceedings. *Id.* When the claimed error involves prosecutorial misconduct, the burden shifts to the state "to demonstrate lack of prejudice; that is, the misconduct did not affect substantial rights." *Ramey,* 721 N.W.2d at 302.

■■ Relying on *State v. Swanson,* 707 N.W.2d 645, 656–57 (Minn.2006), Van Keuren claims that the prosecutor in his case impermissibly argued that Van Keuren had tailored his trial testimony to explain away unfavorable evidence. In *Swanson,* the State, in its cross-examination and closing argument at trial, implied that the defendant, by exercising his rights under the Confrontation Clause of the United States Constitution to be present at trial and to hear the evidence against him, tailored his testimony to fit the evidence presented at trial. *Id.* at 656–57. We concluded that a prosecutor "cannot use a defendant's exercise of his right of confrontation to impeach the credibility of his testimony, at least in the absence of evidence that the defendant has tailored his testimony to fit the state's case." *Id.* at 657–58. That holding, by its plain language, is limited to cases in which the state's argument infringes on the defendant's Confrontation Clause rights and cannot be read so broadly as to preclude the state from otherwise commenting on a defendant's credibility.

We were concerned in *Swanson* with protecting the defendant's Sixth Amendment rights to confront witnesses and to be present at trial because a defendant's mere presence in the courtroom says nothing probative about his or her guilt. Thus, our holding in *Swanson* was limited to preventing "questions and comments by the prosecution imply[ing] that all defendants are less believable simply as a result of exercising the right of confrontation." *Id.* at 658. All of our subsequent cases applying *Swanson,* in which statements by prosecutors have been deemed improper, reflect our concern as set out in *Swanson. See, e.g., id.* at 657 ("Defendant heard everything the state had to offer."); *State v. Mayhorn,* 720 N.W.2d 776, 790 (Minn. 2006) ("prosecutor noted ... Mayhorn had an opportunity to review the state's evidence"); *State v. Davis,* 735 N.W.2d 674,

679 (Minn.2007) ("[Y]ou sat in court here throughout these proceedings ... and listened to all the testimony?").

There is nothing in *Swanson* or its progeny to support Van Keuren's basic argument that the State may not generally challenge the credibility of a defendant's testimony. Nor has Van Keuren articulated any reason that would justify an expansion of the prohibition set out in *Swanson* to include general challenges to the credibility of a defendant's testimony. We have consistently held that counsel may use "all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefrom" during closing argument. *State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn.1980). We affirm that proposition today.

In this case, the State's closing argument did not expressly or impliedly infringe on Van Keuren's right to confront the witnesses against him or be present at trial. The State's argument did not in any way draw attention to Van Keuren's presence in the courtroom or his opportunity to hear all of the evidence, and it did not ask the jury to draw conclusions from Van Keuren's exercise of his constitutional rights. Viewing the State's closing argument as a whole, we conclude that the contested portion of the argument is nothing more than a legitimate and permissible challenge to the credibility of Van Keuren's testimony, which does not constitute prosecutorial misconduct.

### III.

Van Keuren also claims that the district court erred by denying his motion for a change of venue. We will not reverse the district court's denial of a change-of-venue motion unless there has been a clear abuse of discretion. *State v. Gilbert*, 268 N.W.2d 576, 581 (Minn.1978).

In other words, Van Keuren must show that the pretrial publicity caused "a real possibility ... that the jury would not render an unprejudiced or unbiased verdict." *State v. Hogan*, 297 Minn. 430, 437, 212 N.W.2d 664, 669 (1973). Van Keuren has not presented any specific evidence to show that the pretrial publicity adversely affected the jurors in this case or that he suffered actual prejudice from the publicity. The jurors stated at voir dire that they knew either nothing or very little about the case, and all of them indicated they could be fair and impartial. Therefore, we conclude that the district court did not abuse its discretion when it denied Van Keuren's change-of-venue motion.

### IV.

Finally, Van Keuren argues that an assistant county attorney may not appear in place of the county attorney at a grand jury to obtain an indictment. We recently addressed this issue in *State v. Clark*, 755 N.W.2d 241 (Minn.2008). We held that assistant county attorneys are authorized to attend grand jury proceedings for the purpose of framing indictments and examining witnesses. *Id.* at 251. As a result, Van Keuren's argument has no merit.

Affirmed.

MAGNUSON, C.J., took no part in the consideration or decision of this case.

MEYER, Justice (concurring).

I write separately to emphasize that the district court's refusal to give a first-degree heat-of-passion manslaughter instruction did not constitute error. In this case, Van Keuren testified that he knew the victim had broken up with him and was dating another man. In addition, the victim had obtained a no-contact order against Van Keuren that was in place at the time of the murder. Van Keuren's

claim of provocation fails in this case for the simple fact that he created the situation that provoked his aggression. By his own admission, Van Keuren broke into the victim's house with a loaded gun and extra ammunition, prepared to shoot himself in the presence of the victim. As the aggressor, he was not entitled to a heat-of-passion instruction. *See Stiles v. State*, 664 N.W.2d 315 (Minn.2003) (upholding denial of heat-of-passion instruction when defendant was the aggressor).