STATE of Minnesota, Respondent,

v.

Kevin Terrance HANNON, Appellant.

No. A04–434.

Supreme Court of Minnesota.

Aug. 18, 2005.

500

John Stuart, State Public Defender, Leslie Joan Rosenberg, Assistant Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, Janelle Kendall, Stearns County Attorney, St. Cloud, MN, for Respondent.

## O P I N I O N

ANDERSON, G. BARRY, Justice.

Kevin Terrance Hannon was charged with and convicted of, among other offenses, the first-degree premeditated murder of his girlfriend, Deborah Tolhurst. Hannon and Tolhurst lived together in St. Cloud, Minnesota and had what was, at best, a rocky relationship; for example, Hannon remarked that he worried about Tolhurst killing him in his sleep and that he "could kill" Tolhurst.

On September 21, 1999, Hannon telephoned Jeffrey Baker, a Sherburne County investigator with the Central Minnesota Drug Task Force. Hannon had previously offered to work as an informant for the task force, and was calling to set up a controlled drug buy from a suspected dealer. Hannon called Baker again at about 1:15 p.m. from the lobby of J.D. Beamer's, a bar approximately four blocks from Hannon's apartment, to talk in more detail about the controlled buy. Baker noticed that Hannon's speech was slurred, and

Hannon admitted that he had been drinking. Two servers at J.D. Beamer's saw Hannon at the bar twice in the early afternoon, and the bar's surveillance tape shows Hannon at the bar during that period of time. Baker and another officer arrived at the bar at 1:30 p.m., but Hannon was not there—he had gone to a nearby liquor store to purchase vodka. As the officers left the bar, they encountered Hannon leaving the liquor store and discussed the controlled buy. At 2:20 p.m., in the presence of the officers, Hannon called the suspected dealer, who told Hannon to call back the next day. Baker then drove Hannon home, but at Hannon's request dropped him off a couple of blocks from Tolhurst's apartment complex at about 2:45 p.m.

When an apartment complex resident, Pamela Cavegn, checked her mail between 3:00 and 4:00 p.m., she saw Hannon walking toward the Hannon/Tolhurst apartment carrying two bottles of vodka. When she left her apartment again to take out the trash some time between 4:30 and 6:00 p.m., she heard Tolhurst screaming at Hannon. Ginger Claseman in Apartment 306, directly adjacent to the Hannon/Tolhurst apartment, heard "thumping" sounds and yelling from the apartment at about 6:30 p.m. These sounds continued intermittently for an hour to an hour and a half. Claseman did not leave her apartment because she did not know if it was safe to do so, and did not call police because she did not own a telephone.

At approximately 9:00 p.m., private security guard Joshua Fredrickson noticed black smoke emitting from the bedroom window of Hannon's apartment as he drove to the apartment building to conduct a walkthrough. Fredrickson called police, went to the third floor, and saw smoke emerging from the bottom and sides of the door to Hannon's apartment. After

pounding on the door and yelling, Fredrickson opened the unlocked door and attempted to enter, but turned back because of the thick, black smoke. Firefighter Steve Richardson arrived shortly thereafter, noticing the smoke and a woman screaming for help from an adjacent apartment. Richardson made his way to Hannon's apartment, discharged a burst of water, and began searching through the apartment on his hands and knees. He found Tolhurst dead in the bedroom next to the bed, face-down, with her hands behind her back. An autopsy later revealed that Tolhurst's arms were bound behind her with duct tape, and that duct tape was also used on her legs and mouth. Gary Fletcher, the second firefighter to reach the scene, observed that the mattress was entirely destroyed by the fire, but nearby pieces of furniture were not, leading Fletcher to conclude that an accelerant had been used.

Hannon was seen at J.D. Beamer's bar some time after 8:30 p.m. At 10:30 p.m., a clerk at Little Duke's, a nearby convenience store, saw Hannon at the store. Hannon made a telephone call from the store and left in a taxi. Police apprehended Hannon at the St. Germain Towers Apartments, hiding in the bedroom of an acquaintance's apartment, on the evening of September 22, 1999.

During Hannon's incarceration following his arrest, he met fellow prisoner Walter Christensen, who was lodged in the Stearns County jail as a result of a DWI conviction. Christensen asked Hannon why he was in custody. Over the course of several conversations, Hannon admitted killing Tolhurst and explained the murder in detail. Hannon told Christensen that a verbal argument had escalated into physical conflict, and that he then began repeatedly hitting Tolhurst. Hannon told Christensen that Tolhurst fell down, and that he then proceeded to kick her "all over." Sometime during the fight, Tolhurst told Hannon she had AIDS. Hannon also admitted binding Tolhurst, and then throwing a burning bag at her feet before leaving the apartment. Hannon made similar admissions to Mark Schendzielos, who was incarcerated at the Stearns County jail with Hannon from September to October of 1999. Schendzielos and Christensen voluntarily revealed the communications with Hannon to police without any promises or inducements.

An autopsy indicated that the cause of Tolhurst's death was the beating, which lasted at least four minutes, but may have lasted much longer. Tolhurst died before the fire was set. She had sustained several fractures and injuries to the face, ribs, neck, and chest, consistent with injuries caused by stomping, kicking, and punching. She died between 6:00 and 9:00 p.m. on September 21, 1999.

Investigators found several bottles of alcohol in the apartment, including several plastic bottles of vodka—a possible accelerant. They also found a roll of duct tape in a box next to the refrigerator. The smoke detector was disarmed, and the living room telephone cord was cut. Investigators also found a severed lamp cord and a severed electrical transformer cord. Two more cut telephone cords were found across or under Tolhurst's body in the bedroom.

A Benton County deputy sheriff, off duty the day of the murder, arrived at J.D. Beamer's at approximately 9:00 p.m. The next morning he noticed a dirty, bloodstained denim shirt in his pickup. When he learned about the murder near Beamer's, he brought the shirt to the St. Cloud police department. The two servers who saw Hannon at the bar the previous day identified the shirt as the one Hannon had been wearing. BCA Forensic Scientist

Ann Gross obtained a DNA profile from the blood on the shirt matching the victim, and also obtained a DNA mixture from sloughed-off skin cells on the shirt collar. She testified that the DNA mixture contained the DNA of at least two individuals, and that she was able to identify a predominant DNA profile in the mixture. That profile matched Hannon's profile, and she testified that the profile would not be expected to occur more than once in the world population among unrelated individuals.

After a jury trial, Hannon was convicted of four counts of first-degree murder and one count of second-degree murder. We reversed those convictions and remanded for a new trial. *State v. Hannon*, 636 N.W.2d 796 (Minn.2001).

At the second trial, Hannon called John Hackbarth, who had also been incarcerated with Hannon, as his only witness. Hackbarth had approached police with information about Hannon in hope of gaining some benefit for himself. The defense sought to use Hackbarth to demonstrate that jail informants or witnesses, in general, are not reliable. On the stand, Hackbarth twice disobeyed the district court's admonishment to make no reference to Hannon's prior trial. Thereafter, the district court halted Hackbarth's live testimony and instead read a summary of Hackbarth's testimony, prepared by the district court and attorneys for both parties, to the jury.

Hannon, in his second trial, was charged with (1) first-degree premeditated murder under Minn.Stat. § 609.185(1) (1998); (2) first-degree felony murder while committing or attempting to commit kidnapping for the purposes of facilitating a felony under Minn.Stat. §§ 609.25, subd. 1(2) (2004), 609.185(3) (1998); (3) first-degree felony murder while committing or attempting to commit kidnapping for the purposes of committing great bodily harm or terrorizing another under Minn.Stat. §§ 609.25, subd 1(3); 609.185(3); (4) first-degree felony murder while committing or attempting to commit arson under Minn. Stat. § 609.185(3); and (5) second-degree intentional murder under Minn.Stat. § 609.19, subd. 1(1) (2004). The district court instructed the jury on each crime charged, but refused Hannon's request that the jury also be instructed on the lesser-included offenses of first-degree heat-of-passion manslaughter under Minn. Stat. § 609.20(1) (2004), and second-degree unintentional felony murder under Minn. Stat. § 609.19, subd. 2(1) (2004). The jury returned a guilty verdict on each charge for which they received instructions. Hannon was convicted of first-degree murder while committing or attempting to commit a kidnapping for the purposes of facilitating a felony and was sentenced to life in prison without the possibility of release under Minn.Stat. § 609.106, subd. 2(2) (2004). We affirm.

Hannon raises the following five issues in this appeal:

(1) Whether the district court violated Hannon's right to present a defense by ordering the cessation of testimony by the sole defense witness after the witness twice violated the district court's instruction to make no reference to Hannon's previous trial;

(2) Whether the district court's examination of Hackbarth and preparation of the summary of his testimony in the presence of defense counsel but not the defendant is reversible error;

(3) Whether the district court violated Hannon's right of confrontation in admitting the testimony of a witness from Hannon's first trial who was unavailable at Hannon's second trial;

(4) Whether the district court erred by allowing an expert to testify that the

predominant DNA profile from a mixture of two or more individuals' DNA matched Hannon's DNA profile and giving a cautionary jury instruction different from the instruction proposed by the defense; and

(5) Whether the district court erred by refusing to submit second-degree felony murder or manslaughter as lesser offenses.

### I.

Hannon first argues that the district court's decision to halt the testimony of his sole witness violated his constitutional right to present a defense. The defense called Hackbarth, an incarcerated informant, to testify concerning a conversation Hackbarth had with Hannon in which Hannon proposed that Hackbarth "take care" of Mark Schendzielos, a witness for the prosecution in Hannon's first trial. After his conversation with Hannon, Hackbarth had become an informer against Hannon, delivering to police a handwritten note allegedly written by Hannon containing the details of a deal whereby Hannon would pay Hackbarth $10,000 to "take care" of the witness. Police discovered through handwriting analysis that only part of the note was written by Hannon, and Hackbarth eventually told defense counsel that he had fabricated the entire story. Hackbarth later admitted the lie to the police as well. Hannon acknowledges that he sought to present Hackbarth's testimony for the purpose of demonstrating the unreliable nature of incarcerated informants. Defense counsel hoped that undermining the credibility of Hackbarth would lead the jury to discount the testimony of Schendzielos and Christensen, the other informants testifying for the state.

While testifying, Hackbarth, after being instructed to refrain from mentioning Hannon's first trial, made two references to the previous trial. In response, the district court halted live testimony. In lieu of Hackbarth's live testimony, the court interviewed Hackbarth in chambers with both parties' counsel (but not Hannon) present, and then read a summary of the testimony to the jury.

■ Hannon argues that Hackbarth's inadvertent references to the first trial were insufficiently prejudicial to require preclusion of the testimony. He further argues that any risk of prejudice could have been ameliorated by a corrective instruction and the preclusion of testimony by Hackbarth violated Hannon's right to present a defense. *See Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We disagree.

■ The district court has wide discretion to regulate the presentation, examination, and conduct of defense witnesses. *State v. Richards,* 495 N.W.2d 187, 195 (Minn.1992); *Batsell v. United States,* 403 F.2d 395, 401 (8th Cir.1968). If a district court unconstitutionally precludes a defense witness's testimony, thereby depriving defendant of his right to present a defense, the reviewing court must remand unless the state proves its burden of showing that the error was harmless. *See Chapman,* 386 U.S. at 23–24, 87 S.Ct. 824; *State v. Conklin,* 444 N.W.2d 268, 275 (Minn.1989). But cessation of Hackbarth's live testimony was not error given the impermissible purpose for which the testimony was offered—to attack the character of incarcerated informants in general. Minnesota Rule of Evidence 404(a)(3) provides that evidence of the character of a witness cannot be admitted in order to prove action in conformity with that character. Nor may a party introduce evidence of a particular individual's character to prove the supposedly inherent character traits of a group of individuals in the hopes that this will lead the jury to question the

credibility of other witnesses in that category. *See id.* Such stereotyping is not relevant evidence. Because the testimony ought not to have been allowed in the first instance, we hold that halting the testimony did not deprive Hannon of his right to present a defense.

 We further note that the right of a criminal defendant to present a defense is not absolute. The defendant's right to present witnesses is subject to rules of procedure and evidence designed to assure fairness and reliability in the determination of guilt. *Taylor v. Illinois,* 484 U.S. 400, 411 n. 15, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) ("In the exercise of [the right to present witnesses,] the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence") (quoting *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Even were the testimony proffered by the defense in the present case relevant and admissible, the district court's decision to halt the testimony after the witness twice disobeyed the district court's instruction to refrain from making any reference to Hannon's first trial was well within the discretion of the district court.[1] *See Richards,* 495 N.W.2d at 195.

## II.

 Hannon next argues that the in-chambers conference at which the summary of Hackbarth's testimony was prepared was a critical stage of the trial, and that Hannon's exclusion from the confer-

---

1. We also note that the curative measure taken by the district court in the present case—conducting an in-chambers interview of the defense witness and reading a summary of the testimony to the jury—was highly irregular. The district court, however, has wide discretion to give curative instructions and control

ence therefore constitutes reversible error. *See State v. Bouwman,* 354 N.W.2d 1, 8 (Minn.1984).

 While the better practice would have been to include the defendant in the conference, particularly since the conference concerned testimony from the only defense witness, we disagree that the failure to include the defendant here constitutes reversible error. The right to be present at a critical stage of the trial may be waived. *State v. Ware,* 498 N.W.2d 454, 457 (Minn.1993). Neither Hannon nor his attorney objected to the creation or use of the summary nor was any objection raised at trial to Hannon's exclusion from the conference. Accordingly, we conclude that Hannon waived any right he had to attend the conference.

We further note that, even if excluding Hannon was error because this conference was a critical stage of the trial, the error was harmless and no new trial is required. As discussed earlier, the evidence was not admissible in the first instance because it was impermissible character evidence. Further, because there is no claim here that counsel for Hannon was ineffective regarding the in-chambers conference, *see Richards,* 495 N.W.2d at 196, the addition of the defendant to the conference would not have "contributed to the fairness of the procedure." *Id.* Any error from Hannon's exclusion was harmless.

## III.

 Hannon next argues that the admission in the second trial of the testimony

the course of the trial, *see Richards,* 495 N.W.2d at 195, but the state cites no authority for the proposition that a district court may give such a summary to the jury as a substitute for excluded live testimony in a criminal case.

given at the first trial by Walter Christensen, who died between Hannon's two trials, denied Hannon his constitutional right to confront witnesses against him.[2] We disagree.

Hannon relies on the recent landmark case of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* held that the Confrontation Clause bars the admission of all testimonial statements in a criminal trial unless the witness testifies at trial, or unless the witness is unavailable and there was a prior opportunity to cross-examine the witness. *Id.* at 59, 124 S.Ct. 1354. In the present case, it is clear that Christensen's testimony at Hannon's first trial was testimonial, that he was unavailable to testify at the second trial, and that he was subject to cross-examination at Hannon's first trial. Hannon contends, however, that his prior opportunity to examine Christensen was inadequate, and thus Christensen's testimony is not permitted under the *Crawford* analysis.

Hannon relies on a decision of the Colorado Supreme Court, *People v. Fry*, 92 P.3d 970 (Colo.2004), to support the proposition that the *Crawford* exception requires an adequate cross-examination. But *Fry* involved a preliminary hearing in which a witness unavailable at the later trial was examined only on the limited question of probable cause, and there was no opportunity to cross-examine for credibility. *See id.* at 979. In the present case, unlike *Fry*, Hannon had full opportunity to cross-examine Christensen at his prior trial, embracing credibility and all other issues.

To determine what constitutes an adequate opportunity for cross-examination, Hannon proposes a rule found in an unpublished Washington Court of Appeals decision. Under *State v. Sherman*, No. 51912–3–I, 2004 WL 1203852 (Wash.App. Div. June 1, 2004), prior testimony would be inadmissible whenever cross-examination of the same witness at a subsequent trial "would have addressed any new material line of questioning not already addressed in the first trial." *Id.* at *3. Specifically, Hannon contends that because his own statement, amounting to a confession, was excluded from the second trial, Christensen was cross-examined "with regard to a completely different theory" of the case at the first trial, and therefore the prior cross-examination was not adequate under *Crawford.*

Appellant's contention does not even meet his own proposed standard. It is not at all clear that cross-examination of Christensen at the second trial would have addressed any "new material line of questioning." *See Sherman*, 2004 WL 1203852 at *3. The state's case at the second trial was largely circumstantial and weaker without Hannon's statement. But the state's theory of the crime was the same at both trials and the evidence at the second trial was largely the same as the first trial. Although the second trial featured more emphasis on the testimony of informants, that testimony was used in the same way and for the same purpose as it was during the first trial. The key requirements for applying the "unavailable witness" exception in *Crawford*—sworn testimony under oath and actual confrontation—are fulfilled by the facts of the present dispute. Hannon's narrow and almost impossible-to-meet standard to admit the prior sworn testimony of an unavailable witness is not required by *Crawford* and we reject it.

**2.** Because Christensen died between Hannon's first and second trial, his testimony from the first trial was read to the jury.

We further note that *Crawford* only requires that the defendant have a prior *opportunity* to cross-examine the witness. 541 U.S. at 59, 124 S.Ct. 1354. The opportunity need not actually be seized. While there may be a case where a prior opportunity was not adequate due to substantial circumstantial differences between the two proceedings, this is not that case.

## IV.

Hannon contends that, because there are inherent difficulties in analyzing a mixture of DNA from multiple sources, random match probability evidence resulting from application of the product rule to a DNA mixture does not fall within the DNA exception to the general prohibition against admission of statistical probability evidence in criminal prosecutions. *See State v. Bloom*, 516 N.W.2d 159, 160 (Minn.1994). Hannon further contends that the district court erred by refusing a defense request to issue a cautionary instruction similar to the one suggested by Justice Alan Page in his *Bloom* concurrence. *See id.*

At trial, forensic scientist Ann Gross presented her analysis of the shirt stained with the victim's blood on the sleeves. Gross testified that she examined a mixture of DNA from skin cells found on the shirt. While she could not say precisely how many persons were represented in the mixture, she was able to identify a predominant profile in the mixture. She testified that this predominant profile matched Hannon's, and that the profile would not be expected to occur more than once in the world population among unrelated individuals. The district court refused to issue the *Bloom* instruction proposed by the defense, and instead issued the following instruction:

Evidence of forensic DNA testing has been introduced in this trial. You should carefully evaluate this evidence as you would any other evidence. It is up to you to determine what, if any, weight should be given to this evidence. In the final analysis, you must decide this case based on all the evidence.

■ Because the issue of the reliability of evidence of a predominant profile in a mixture of DNA from two or more persons was not raised at the district court level, there is no discussion or presentation of evidence in the record regarding the Hannon's claim that it is not appropriate to use random match probability here. Additionally, there was no objection to the scientist's random match probability testimony. The issue is waived. *State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989).

■ Hannon's claim fails on its merits as well. In *State v. Roman Nose*, we cited standards adopted by the DNA Advisory Board (DAB) approving of the use of random match probability statistics generated by the product rule and found that such evidence falls within the DNA exception to the general prohibition against the use of statistical probability evidence in a criminal case. 667 N.W.2d 386, 397 (Minn. 2003). While there were sufficient single source samples in *Roman Nose* to implicate the defendant without resorting to multiple source samples, the DAB guidelines we relied upon in that case state that the product rule may be utilized in the case of a mixture containing a predominant profile. *Id.* at 398 n. 10 (citing DNA Advisory Board, *Statistical and Population Genetics Issues Affecting the Evaluation of the Frequency of Occurrence of DNA Profiles Calculated from Pertinent Population Database(s)*, Forensic Science Communications, 2, July 2000 at 5, available at *http://www.fbi. gov/hq/lab/fsc/ backissu/july2000/ dnastat.htm*).

In the present case, the forensic scientist testified that she determined that the

mixture was amenable to interpretation because a particular profile was sufficiently prominent to utilize the product rule. Furthermore, the scientist did not give a bald percentage that the jury could mistake for a measure of the probability of Hannon's guilt. *See State v. Joon Kyu Kim,* 398 N.W.2d 544, 548 (Minn.1987); *State v. Boyd,* 331 N.W.2d 480, 483 (Minn. 1983). Such testimony falls within the DNA exception.

■ There remains the propriety of the jury instruction regarding DNA evidence. The issuance of a jury instruction lies within the discretion of the district court and will not be reversed but for an abuse of that discretion. *State v. Cole,* 542 N.W.2d 43, 50 (Minn.1996). If the defense was not prejudiced by a refusal to issue an instruction, there is no reversible error. *State v. Kuhnau,* 622 N.W.2d 552, 555 (Minn.2001). Further, if the court's chosen instruction is read to the jury in language understandable by the jury and correctly states the law, there is no reversible error. *State v. Peou,* 579 N.W.2d 471, 475 (Minn.1998).

Here, the district court did not refuse to give a cautionary instruction—rather, it chose to use an instruction differing from that requested by the defense. The instruction actually given was cautionary in more generic terms than the proposed *Bloom* instruction, but falls well within the discretion of the district court. *See Roman Nose,* 667 N.W.2d at 397–98 (holding that it was not error for the court to refuse to issue a cautionary instruction when the court feared such an instruction would highlight the importance of DNA evidence over other evidence).

## V.

Hannon also contends that the district court erred when it refused to instruct the jury on the lesser-included offenses of heat-of-passion manslaughter and second-degree unintentional felony murder. The court instructed the jury on one count of first-degree premeditated murder, two counts of first-degree intentional felony murder (kidnapping), one count of first-degree intentional felony murder (arson), and one count of second-degree intentional murder. The jury found Hannon guilty of each charge.

■ Under Minn.Stat. § 609.04, subd. 1 (2004), a defendant "may be convicted of either the crime charged or any included offense, but not both." An included offense includes a lesser degree of the same crime. *Id.,* subd. 1(1). In Minnesota, every lesser degree of murder is intended by § 609.04 to be characterized as an included offense. *State v. Leinweber,* 303 Minn. 414, 421, 228 N.W.2d 120, 125 (1975). As such, heat-of-passion manslaughter and second-degree unintentional felony murder—the instructions requested by Hannon—constitute lesser-included offenses of first-degree murder.

■ Although we review the denial of a requested lesser-included offense instruction under an abuse of discretion standard, where the evidence warrants a requested lesser-included offense instruction, the district court must give it. *State v. Dahlin,* 695 N.W.2d 588, 597 (Minn. 2005); *Leinweber,* 303 Minn. at 422, 228 N.W.2d at 125–26. The evidence warrants a lesser-included offense instruction when 1) the lesser offense is included in the charged offense; 2) the evidence provides a rational basis for acquitting the defendant of the offense charged; and 3) the evidence provides a rational basis for convicting the defendant of the lesser-included offense. *Dahlin,* 695 N.W.2d at 595; *Leinweber,* 303 Minn. at 422, 228 N.W.2d at 125–26.

In *Dahlin*, we recently held that district court judges must look at the evidence in the light most favorable to the party requesting the instruction when determining whether a rational basis exists in the evidence for acquitting of the greater charge and convicting of the lesser. 695 N.W.2d at 598. We further held that, "under the 'light most favorable' standard, when evidence exists to support the giving of the instruction, it is an abuse of discretion for a trial court judge to weigh the evidence or discredit witnesses and thereby deny an instruction." *Id.*

We first consider Hannon's claim that the district court erred in refusing his request for an instruction on the lesser-included offense of heat-of-passion manslaughter. Heat-of-passion manslaughter requires a showing that a defendant intentionally caused the death of another person (1) in the heat of passion (2) provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances. Minn.Stat. § 609.20(1) (2004). Establishing the first element—whether the killing took place in the heat of passion is a subjective inquiry—focuses on the defendant's emotional state. *State v. Quick*, 659 N.W.2d 701, 711 (Minn.2003). When a defendant is in the heat of passion, his *reason is clouded and his willpower weakened. Id.* Anger alone is not sufficient for heat of passion. *State v. Stewart*, 624 N.W.2d 585, 590 (Minn.2001). Establishing the second element—whether a person of ordinary self-control under like circumstances would be provoked—requires an objective analysis. *Quick*, 659 N.W.2d at 711. Under the statute, "a 'person of ordinary self-control' does not include a person under the influence of intoxicants or a controlled substance." Minn.Stat. § 609.20.

Hannon did not testify at trial. Thus, Hannon relies on evidence presented by the state to support his claim that the court improperly denied his request for a heat-of-passion manslaughter instruction. The state called two men who had been jailed with Hannon and who testified that he had told them about his involvement in Tolhurst's killing. Mark Schendzielos shared a jail cell with Hannon during the fall of 1999, following Hannon's arrest for Tolhurst's murder. He testified that Hannon "wanted to tell his story" and make it clear that "the woman was not the hero in this case and that she was not an innocent." Schnedzielos testified that Hannon confided that both he and Tolhurst were in a "drunken stupor" the day of the killing. Schendzielos testified that Hannon had told him that the two were engaged in a "scuffle and argument" that "got physical," and that *during* this physical fight, Tolhurst "enraged" Hannon by giving him a "hard time" and "tormenting him a little bit about joking around about an AIDS virus that she may have inflicted on him."

Walter Christensen also testified that he spoke with Hannon while they were in jail together during the fall of 1999. Christensen stated that Hannon told him he had killed Tolhurst during a fight. Specifically, Christensen testified that Hannon confided that *while* he and Tolhurst were exchanging blows, "things got really heated up" before Hannon "knocked [Tolhurst] down," causing her hairpiece to fall off. Christensen stated "[t]hat's when she told him that he's got AIDS—she's got AIDS." After this revelation, Hannon told Christensen that he "continued hitting her and hitting her," stopping at some point to bind Tolhurst with duct tape.

According to Hannon, the combined testimony of Schendzielos and Christensen created a rational basis for the jury to conclude that Hannon killed Tolhurst in the heat of passion. We disagree. We first emphasize that Hannon's assertion on appeal that he was in a "drunken rage" is

irrelevant to our analysis, as heat-of-passion manslaughter requires a showing that the defendant be provoked by such words or acts of another as would provoke a *sober* person of ordinary self-control under like circumstances. *See* Minn.Stat. § 609.20(1) (2004).

Next, we note that the testimony of Schendzielos and Christensen indicates that Hannon's assault of Tolhurst was not provoked by Tolhurst's statement that she had AIDS. Rather, Hannon's assault of Tolhurst was *already* underway when Tolhurst stated that she had AIDS, and the assault "continued" after Tolhurst's statement—apparently without change. Indeed, Hannon has acknowledged in his brief to our court that Tolhurst said that she had AIDS "in the middle of an escalating fight." Thus, all the evidence adduced regarding Hannon's state of mind while he beat Tolhurst to death establishes that Hannon had been provoked to violence—for unknown reasons—well before Tolhurst said that she had AIDS. Under these particular facts, we conclude that the evidence, when viewed in the light most favorable to Hannon, did not create a rational basis for the jury to find that Hannon killed Tolhurst in the heat of passion.

 In so holding, we are mindful of our statement in *Dahlin* that "[t]rial courts may not weigh the evidence or make credibility determinations when determining if a lesser-included offense instruction is warranted." 695 N.W.2d at 598. We emphasize that our conclusion here does not require us to make credibility determinations or weigh the evidence adduced regarding whether Hannon was provoked to kill Tolhurst in the heat of passion. Rather, we have assumed that Schenzielos' and Christensen's testimony credibly reflected the events on the night of Tolhurst's death, that partway through Hannon's assault of Tolhurst she told him she had AIDS, and that this statement

angered Hannon. However, in cases in which no evidence is adduced to support acquitting of the greater charge and convicting of the lesser, the lesser instruction is not required. *Dahlin*, 695 N.W.2d at 595. Here, no evidence was adduced to indicate that Hannon's ongoing assault of Tolhurst altered in its nature or intensity when Tolhurst told Hannon she had AIDS. Although the testimony of Christensen and Schenzielos establishes that Hannon was angered by Tolhurst's statement that she had AIDS, no evidence was adduced to demonstrate that Tolhurst's statement served to cloud Hannon's reason or weaken his willpower beyond the emotional state he was in as he was assaulting Tolhurst before the comment about AIDS. Under our case law, "anger alone" does not create a basis for concluding that a killing occurred in the heat of passion. *Stewart*, 624 N.W.2d at 590. Because the testimony of Schendzielos and Christensen did not create a rational basis for the jury to convict Hannon of heat-of-passion manslaughter, we hold that the district court properly refused Hannon's request for a heat-of-passion manslaughter instruction.

 We now turn to Hannon's argument that the district court erred in refusing to submit an instruction for second-degree unintentional felony murder because evidence was presented indicating that Hannon was voluntarily intoxicated at the time of the killing, creating a fact question regarding whether he was capable of forming the requisite intent to commit first-degree premeditated murder and/or second-degree intentional murder. Under Minn.Stat. § 609.075 (2004), "when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

 The record establishes that Hannon was likely intoxicated on the day of

Tolhurst's murder. But, our review of the record indicates that Hannon did not request an instruction on voluntary intoxication.[3] "A defendant's failure to propose specific jury instructions or to object to instructions before they are given to the jury generally constitutes a waiver of the right to appeal." *State v. White*, 684 N.W.2d 500, 508 (Minn.2004); *see also* Minn. R.Crim. P. 26.03 subd. 18(3). We have specifically stated that a trial court judge has no obligation to instruct the jury, *sua sponte*, concerning the defense of intoxication. *State v. Rainey*, 303 Minn. 550, 551, 226 N.W.2d 919, 921 (1975). Because Hannon did not request an instruction on voluntary intoxication, we hold that he forfeited his right to assert error on this point.

■■■■ We now turn to Hannon's claim that the district court erred in refusing his request for a jury instruction on second-degree unintentional felony murder. Unintentional felony murder requires a showing that the defendant unintentionally caused the death of another person while committing or attempting to commit a felony. Minn.Stat. § 609.19, subd. 2(1) (2004). In deciding whether to give this instruction, the court was required to determine whether a rational basis existed in the evidence to acquit Hannon of the greater crimes for which he was charged and convict him of unintentional felony murder. The element of intent distinguishes unintentional felony murder from the other crimes with which Hannon was charged. Questions of intent are not easily susceptible to direct proof, and usually can only be inferred by a jury from the evidence presented. *Dahlin*, 695 N.W.2d at 601 (citing *State v. Fratzke*, 354 N.W.2d 402, 409 (Minn.1984) (stating de-

terminations of intent are primarily questions of fact for the jury "to decide on the basis of their experiences in life and common sense")).

■■■■ This case requires us to decide under what circumstances a defendant accused of intentionally killing another via assault is entitled to the lesser-included offense instruction of unintentional felony murder, with assault as the underlying felony. As *Dahlin* makes clear, trial courts may not weigh the evidence and evaluate credibility when determining whether a lesser-included offense instruction is warranted. 695 N.W.2d at 598. Thus, the test in this case is not whether the evidence is sufficient to establish that the killing was intentional, but whether the evidence created a rational basis for a jury to conclude that the killing was unintentional. Accordingly, there may be cases in which the evidence that a defendant intentionally killed his victim via assault is very strong, but contrary evidence indicates the killing was the unintentional result of an assault. Such cases mandate the lesser-included offense instruction. But, in cases in which no evidence is adduced to create a rational basis for a jury to conclude that the killing was the unintentional result of an assault, the lesser instruction is not required. *See Dahlin* 695 N.W.2d at 595. This case falls into the latter category.

Here, neither Hannon nor the state presented evidence that created a rational basis for the jury to conclude that Hannon unintentionally killed Tolhurst during an assault. Hannon's theory of defense was that he did not assault and kill Tolhurst. Hannon's counsel argue during closing that the shirt found shortly after the murder with his DNA and Tolhurst's blood on it was planted by the police, that Schendzielos and Christensen fabricated Han-

---

**3.** We further note that Hannon has not argued on appeal that he requested an involuntary intoxication instruction.

non's confessions in order to receive lighter sentences, and that his conduct the night of the killing did not comport with the conduct of someone who had recently beaten his girlfriend to death. We have stated that a warranted lesser-included offense instruction cannot be denied on the grounds that it is inconsistent with the defendant's theory of the case. *See Dahlin,* 695 N.W.2d at 600–01; *Leinweber,* 303 Minn. at 417–18, 228 N.W.2d at 123. But, unlike the facts set forth in *Dahlin* and *Leinweber,* not only did Hannon's counsel present a theory that was inconsistent with the requested lesser-included offense instruction, no other evidence was presented to indicate that Hannon unintentionally killed Tolhurst during an assault. Accordingly, we hold that the district court properly denied Hannon's request for an instruction on second-degree unintentional felony murder.

Affirmed.