STATE OF MINNESOTA

IN SUPREME COURT

A22-1283

Court of Appeals

State of Minnesota,

Respondent,

vs.

Robert Lee Baker, III,

Appellant.

Hudson, C.J.
Took no part, Gaïtas, J.

Filed: November 13, 2024
Office of Appellate Courts

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Kathryn M. Keena, Dakota County Attorney, Jessica A. Bierwerth, Assistant Dakota County Attorney, Hastings, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

The proper standard for determining whether a defendant is entitled to a jury instruction on self-defense or defense of others is whether the defendant produced reasonable evidence to support their claim, and, if so, whether such evidence was sufficient to shift the burden to the State to disprove the elements beyond a reasonable doubt. A defendant's burden is satisfied if they have presented sufficient evidence from which a reasonable juror could have found defendant acted in self-defense.

1

Applying the proper standard, appellant was entitled to his requested jury instructions on self-defense and defense of others, and the district court's failure to give these instructions was not harmless.

Reversed and remanded.

O P I N I O N

HUDSON, Chief Justice.

This case requires us to decide whether the district court abused its discretion by refusing to instruct the jury on self-defense and defense of others. The decedent, Maurice Anderson, and an accomplice robbed appellant Robert Lee Baker, III, and his girlfriend in a car at gunpoint. As Anderson and the accomplice were carrying away Baker's property, Baker got out of the car with a firearm and demanded the return of his property. In response to the demand, Anderson raised his firearm. Baker then shot and killed Anderson. Based on his actions, the State charged Baker with second-degree intentional murder.

At trial, Baker claimed self-defense and defense of others, but the district court concluded that Baker was not entitled to jury instructions on those defenses. Explaining its decision, the district court stated that Baker failed to establish two elements of his defenses: that he was not the initial aggressor and that he did not have a reasonable means to retreat.

The court of appeals affirmed, but on different grounds. After acknowledging that the evidence about whether Baker was the initial aggressor and whether he had a reasonable means to retreat was "somewhat muddled," the court of appeals affirmed because it

concluded that Baker's use of deadly force was unreasonable as a matter of law. *State v. Baker*, No. A22-1283, 2023 WL 8013919, at *3 (Minn. App. Nov. 30, 2023).

We disagree. We conclude that Baker presented sufficient evidence to satisfy his burden to obtain jury instructions on self-defense and defense of others. Accordingly, we conclude that the district court abused its discretion by refusing to instruct the jury on self-defense and defense of others. This error was not harmless, and therefore we reverse the decision of the court of appeals and remand for a new trial.

**FACTS**

The State charged Baker with one count of second-degree intentional murder, *see* Minn. Stat. § 609.19, subd. 1 (2022), for causing the death of Maurice Anderson with intent but without premeditation.[1] The following evidence was established at trial.

On November 9, 2020, at 8:58 p.m., police received reports of gunshots fired near a hotel in Eagan, Minnesota. A police officer traveling to the scene pulled over a car matching the description of the suspect's car. The car's occupants—Baker and his girlfriend—were arrested. Inside the car, officers found a Sig Sauer BB gun and a .40-caliber Glock handgun. During the arrest, Baker appeared distressed and mentioned that men had jumped into the car.

---

[1] Baker was also charged with one count of unlawful possession of a firearm. *See* Minn. Stat. § 624.713, subd. 2 (2022). Baker pleaded guilty to the possession charge and proceeded to a jury trial only on the second-degree murder charge. The possession conviction is not an issue before this court and is not impacted by the disposition of this case.

3

Meanwhile, police found Anderson's body near the hotel's parking lot. Anderson had been shot 11 times, resulting in his death. Seven bullets entered Anderson's body from back to front, with one entering the back of his neck, three entering his back, and three entering the back of his thighs. Sixteen .40-caliber cartridge casings were recovered from the scene, along with the girlfriend's purse containing approximately $2,200.

Baker did not testify at trial, so the following testimony was established from three different Mirandized statements Baker made to the police following his arrest. On the evening of November 9, Baker made his first statement, when he initially reported the following facts. Baker and his girlfriend were picking up the girlfriend's friend at another nearby hotel when three men entered the car and robbed them at gunpoint. The girlfriend was the driver, Baker was in the passenger seat, the friend was in the backseat, and the assailants jumped into the backseat. The assailants instructed the girlfriend to drive and told her to stop a few feet from the hotel's entryway. They took Baker's keys and wallet, over $2,000 in cash, and the girlfriend's purse. Baker reported that "after they took everything shortly after that ah there was—there was some gunfire." He claimed that he did not know where the gunfire came from, that he did not see the shooting happen, and that he never got out of the car.

During the interview, Baker asked to talk to his mom. After speaking with her, Baker's story about the circumstances of the shooting changed. He stated:

Maybe 30 seconds after [the friend] got in the car two males came, got in the car with guns. Put one to my girl's head and put one to mine. Told us to pull off. We pulled off. They told me to put my hands in the air. The whole time I had one hand in the air. At—after they took everything they got out of the

4

car and they walked off.  After that I got out of the car and kind of chased 'em.

Baker confirmed that he had a gun and told the assailants to "[g]ive him [his] s*** back." Then, Anderson raised his gun, and Baker started shooting.  Once Baker saw Anderson fall down, Baker got back in the car, and the car drove off.

On November 10, the detectives talked to Baker again.  Baker recounted that the assailants made the girlfriend drive to the hotel and park in the street.  Once parked, the assailants got out of the car, went to the driver's side where the girlfriend was sitting, and demanded that she give them her keys.[2]  After this exchange with the girlfriend, the assailants began walking away with the stolen items.  At that point, Baker jumped out of the car and demanded the assailants return Baker's and the girlfriend's items.  Baker had his firearm in his hand.[3]  In response, one of the assailants, Anderson, "upped the gun." Baker estimated that Anderson was approximately 30 feet away, and that Baker himself was approximately seven feet from the car.  Baker began to shoot at Anderson.  After Anderson went down, Baker went over to Anderson and grabbed the girlfriend's phone

---

[2]     Because the girlfriend was able to drive the car away after the altercation ended, it logically follows that she did not end up giving the assailants her keys.

[3]     In the transcript of the interview, Baker appears to demonstrate how he was holding the gun in his hand, but it is not described well in the transcript:

  RB:  So I have my gun in my hand the whole time
  DT:  Ok
  RB:  Like, I'm like this
  DT:  Ok
  RB:  You know what I'm saying, but I didn't want to put them in harm's way

and Anderson's gun.[4] Baker then ran back to the car. When asked how he got blood on his shirt, Baker stated, "[A]fter I seen him like going down I was like closer." He also said that he wanted to make sure the assailants were away from the girlfriend's side of the car in case they began shooting.

Detectives took Baker's third statement on November 11, 2020. In his third statement, Baker provided the following information about his proximity to the assailants during the shooting. First, Baker denied that he started chasing Anderson before firing his gun. He explained that he got out of the car as the assailants were "walking and exchanging items" and asked the assailants to "give our s*** back." In response to his demand, both assailants raised their guns, Baker started firing,[5] and then Baker "took off running and chased after them." Baker explained that when he first started shooting, he was standing still, but then Anderson "got out of [Baker's] visual," and that is when Baker took off running. He stated, "I started firing and he took off, there was a car right here it was like we were still facing each other when he took off and like like if he was gonna run back to me but then he like bolted off to the right." Baker agreed with the investigator that he started moving "because [Anderson] was going in through a car," and at that point, Baker was not aiming but just shooting. Baker estimated that the closest he was firing at Anderson was from three or four feet away, and that he stopped shooting when he was maybe two to three feet away from Anderson, who had "just hit the ground."

---

[4]      The gun was in fact a Sig Sauer BB gun made to look like a real firearm.

[5]      Baker estimated that he started shooting about 45 seconds after the assailants exited the car.

In addition to the Mirandized statements, Baker also made numerous jail calls. In a conversation with the girlfriend, Baker reflected that when the girlfriend tried to grab him to prevent him from getting out of the car, "it was already over with, I was out of the car already . . . I got this slammin on their ass. Oh they real they thought they was sweet. They pissed me off." He said that he was "mad as hell the other [man] got away." He continued, saying, "I think [the police are] lying they say the mother f***** got a 11 polka dots . . . I didn't know the mother f***** got a party thrown on him until the mother f***** started doing the worm . . . went down . . . then it was it was over with after that." Baker also said, "[the man] was still running" and "shorty was eating em joints at first. On my life . . . he was still running." When talking with an unidentified man, Baker said, "So they talking . . . because I chased the mother f***** it's going to be hard to prove self-defense."

As part of the investigation, a forensic scientist at the Bureau of Criminal Apprehension examined the 16 cartridge casings found at the scene and determined that all 16 casings came from the same firearm. At trial, the scientist testified that a shooter could have fired the 16 rounds in just over five seconds. He also stated that it is difficult to tell, based on where a cartridge casing is found, exactly where the shooter might have been. Similarly, the medical examiner could not give a definite opinion on how far away Baker was when each shot was fired. This constituted the sole forensic testimony introduced at trial.

Before closing arguments, the defense moved for a jury instruction on self-defense and defense of others, which the State opposed. Although the district court had allowed the defense to introduce those defenses during opening arguments, it ruled, at the close of

7

evidence, that it would not be instructing the jury on self-defense and defense of others. Explaining the decision, the district court found that the robbery was over and the defendant "re-engaged" by exiting the car with a gun. The court stated that the defense failed to establish that Baker was not the initial aggressor because he re-engaged in contact with the victim, and that Baker did not have a reasonable means to retreat. The jury found Baker guilty of second-degree intentional murder, and the district court sentenced him to 438 months in prison.[6]

The court of appeals affirmed, but it determined that the elements of self-defense relied on by the district court—aggression and retreat—were "complex and somewhat muddled under the facts of this case." *Baker*, 2023 WL 8013919, at *3. Ultimately, the court of appeals did not decide the issues of aggression or retreat but instead affirmed because it concluded that Baker did not, as a matter of law, use a reasonable amount of force. *Id.* at *4. Because "no reasonable jury could find that Baker 'used only the level of force reasonably necessary to prevent the harm feared,' " the court of appeals held that the district court did not abuse its discretion by not instructing the jury on the law of self-defense. *Id.* (quoting *State v. Glowacki*, 630 N.W.2d 392, 399 (Minn. 2001)).

Judge Johnson filed a special concurrence, concluding that "the district court did not abuse its discretion by refusing to give the requested instruction for the reasons stated by the district court." *Id.* at *4 (Johnson, J., concurring). "Baker could have safely driven

---

[6]    The district court sentenced Baker to 60 months on the unlawful possession of a firearm conviction, to be served concurrently with his second-degree murder sentence.

away from the scene and avoided further conflict." *Id.* But "[i]nstead Baker chased Anderson, whom Baker knew was armed, thereby creating a new confrontation." *Id*.

This court granted Baker's petition for review.

**ANALYSIS**

Determining whether to give a jury instruction "lies within the discretion of the district court and will not be reversed but for an abuse of that discretion." *State v. Hannon*, 703 N.W.2d 498, 509 (Minn. 2005). "It is an abuse of the district court's discretion to refuse to give an instruction on the defendant's theory of the case 'if there is evidence to support it.' " *State v. Johnson*, 719 N.W.2d 619, 629 (quoting *State v. Kuhnau*, 622 N.W.2d 552, 557 (Minn. 2001)). But "[i]f the defense was not prejudiced by a refusal to issue an instruction, there is no reversible error." *Hannon*, 703 N.W.2d at 509.

A.

To be entitled to jury instructions on self-defense or defense of others, the defendant has the burden of going forward with evidence to support the claim. *Johnson*, 719 N.W.2d at 629. If a defendant meets this burden, the defendant is entitled to the self-defense instruction, and the burden then shifts to the State to disprove, beyond a reasonable doubt, that the defendant was not acting in self-defense. *State v. Trifiletti*, 6 N.W.3d 79, 96 (Minn. 2024). Baker asserts that the court of appeals used an incorrect standard when analyzing whether he met his burden to come forward with evidence to support his defenses of self-defense and defense of others. The court of appeals stated that "[t]he claim of self-defense is sufficiently raised when a defendant creates a reasonable doubt as to

9

whether the level of force was justified." *Baker*, 2023 WL 8013919, at *3 (citing *State v. Soukup*, 656 N.W.2d 424, 429 (Minn. App. 2003)). We agree with Baker.[7]

We take this opportunity to reiterate the standard for determining whether a defendant is entitled to a jury instruction on self-defense or defense of others. The inquiry is "whether [the defendant] produced reasonable evidence to support [their] claim, and, if so, whether such evidence was sufficient to shift the burden to the state to disprove the elements beyond a reasonable doubt." *Johnson*, 719 N.W.2d at 629. A defendant's burden is satisfied if they have presented "sufficient evidence from which a reasonable juror could have found [the] defendant acted in self-defense." *State v. Gray*, 456 N.W.2d 251, 257–58 (Minn. 1990); *see also Johnson*, 719 N.W.2d 630–32 (holding that the defendant "met [their] burden of coming forward with evidence to support each element of [their] claim of self-defense" after concluding there was evidence to support the reasonable conclusion that each element of self-defense was met). A court must view the evidence in a light most favorable to the defendant when making this determination. *Id.* (explaining that "it is the jury's duty to determine what evidence is credible" and that " '[i]n keeping with the presumption of innocence, trial courts should resolve all doubts as to the legitimacy of a

---

[7] The court of appeals has used this "reasonable doubt" standard when articulating a defendant's burden of going forward with evidence to support a claim of self-defense in at least four precedential decisions. *See Soukup*, 656 N.W.2d at 429; *State v. Johnson*, 392 N.W.2d 357, 358 (Minn. App. 1986); *State v. Stephani*, 369 N.W.2d 540, 546 (Minn. App. 1985); *State v. Liggons*, 348 N.W.2d 785, 791 (Minn. App. 1984). Although we have long applied a different standard, the court of appeals continues to use the standard articulated in *Soukup* and other court of appeals cases. To ensure the correct standard is used, we overrule the portions of these court of appeals cases addressing when a defendant has satisfied their burden of going forward with evidence to support a claim of self-defense.

self-defense claim in favor of the defendant' " (quoting *State v. Boitnott*, 443 N.W.2d 527, 533 n.2 (Minn. 1989))).

The elements of self-defense include:

(1) The absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that he or she was in imminent danger of death or great bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger.

*State v. Basting*, 572 N.W.2d 281, 285 (Minn. 1997).

There is an additional requirement for claims of self-defense and defense of others: "The *degree of force* used in self-defense must not exceed that which appears to be necessary to a reasonable person under similar circumstances." *Id.* at 286 (emphasis added); *see also Glowacki*, 630 N.W.2d at 403 (explaining that "[a] defendant claiming self-defense may use a *level of force* that is reasonable . . ." (emphasis added)). Although we do not label the "degree of force" requirement as an element of a self-defense claim, we have treated the requirement as part of the defense. For example, when the burden shifts to the State to disprove a claim of self-defense, the State may disprove the claim by disproving any of the four elements or by disproving that the degree of force used was reasonable. *Compare State v. Radke*, 821 N.W.2d 316, 325 (Minn. 2012) (concluding that the defendant's self-defense claim failed because the State disproved that the defendant was not the initial aggressor), *with Basting*, 572 N.W.2d at 286 (concluding that the district court did not err when it found that the defendant did not act in self-defense in part because it "could have determined that [the defendant] used more force than was necessary"). Consequently, as part of the burden to come forward with evidence to support the

11

self-defense claim, the defendant must present sufficient evidence from which a reasonable juror could find that the degree of force used was reasonable.

The defenses of self-defense and defense of others are born out of the same statutory language. *See* Minn. Stat. § 609.06, subd. 1(3) (2022) (authorizing reasonable force "when used by any person in *resisting or aiding another to resist* an offense against the person" (emphasis added)). We have said these two defenses parallel each other, *State v. Richardson*, 670 N.W.2d 267, 278 (Minn. 2003), but have recently articulated that as to the fourth element—the duty to retreat—for a claim of defense of others "a defendant must subjectively believe that the person in peril has no reasonable possibility of safe retreat, and that belief must be objectively reasonable based on the information available to the defendant at the time that they use force to defend the person in peril." *State v. Valdez*, ___ N.W.3d. ___, No. A22-1424, 2024 WL 4447067, at *7 (Minn. Oct. 9, 2024).

### B.

We next consider whether, under the proper standard just described, Baker presented sufficient evidence to support his claims of self-defense and defense of others such that he was entitled to jury instructions on these defenses. In doing so, we "must view the evidence in the light most favorable to the party requesting the instruction to determine whether the trial court abused its discretion." *Turnage v. State*, 708 N.W.2d 535, 545–46 (Minn. 2006); *see also Boitnott*, 443 N.W.2d at 533 n.2 (stating that "[i]n keeping with the presumption of innocence, trial courts should resolve all doubts as to the legitimacy of a self-defense claim in favor of the defendant").

12

Neither party disputes that Baker presented sufficient evidence from which a reasonable juror could find that he had an actual and honest belief that he was in imminent danger of bodily harm or death or that he had reasonable grounds for that belief. Instead, the parties dispute whether there is sufficient evidence from which a reasonable juror could find that Baker was not the initial aggressor, that Baker lacked a reasonable means to retreat, and that the degree of force he used was reasonable.

We begin by addressing the first disputed element: absence of aggression or provocation on the part of the defendant. Baker argues that he presented sufficient evidence that he was not the initial aggressor. He presented the following evidence about the altercation. Two assailants entered Baker's car and took his personal property at gunpoint. Then, when the assailants were only approximately 30 feet away from the car, Baker got out of the car and demanded that they return his property. Baker was in possession of a firearm when he exited the car.

There is no dispute that Baker re-engaged with the victim when he exited the car. But we also acknowledge that if the robbery was ongoing, then Baker was entitled to reasonably resist the robbery. *See* Minn. Stat. § 609.06, subd. 1(4) (2022) (providing that a person may use reasonable force to resist the trespass upon their personal property). When viewed in a light most favorable to Baker, it is reasonable to infer that the robbery was ongoing when Baker exited the car and demanded his belongings back. *See United States v. Pate*, 932 F.2d 736, 738 (8th Cir. 1991) (stating that the escape phase is part of the robbery). Based on the specific evidence presented in this case, we conclude

13

that Baker satisfied his burden by presenting sufficient evidence from which a reasonable jury could find that he was not the initial aggressor.

Next, we address the duty to retreat. For Baker's claim of self-defense, we must determine whether he presented sufficient evidence that he lacked a reasonable opportunity to retreat. For his claim of defense of others, we must determine whether he presented sufficient evidence that he subjectively believed that the two women did not have a reasonable opportunity to retreat safely and that this belief was objectively reasonable based on the information available to him at the time. *Valdez*, ___ N.W.3d. ___, 2024 WL 4447067, at *7.

The evidence about Baker's and the women's ability to retreat, viewed in the light most favorable to Baker, is as follows. Baker, standing about seven feet away from the car, demanded that the assailants return his property. In response, both assailants, who were approximately 30 feet away from the car, raised their guns at Baker. The two women who were inside the car were in the line of fire, and Baker had previously heard one of the assailants demand the car's keys from one of the women. We conclude that Baker presented sufficient evidence from which a jury could reasonably conclude that Baker, with guns pointed at him, did not have a reasonable opportunity to retreat and that it was objectively reasonable to believe that the two women, who were also in the assailants' line of fire, had no reasonable means to retreat.

Having concluded that Baker presented sufficient evidence to satisfy his burden regarding the elements of aggression and retreat, we next turn to whether Baker presented sufficient evidence that he used a reasonable degree of force. The evidence favorable to

14

Baker includes that Baker had just been robbed at gunpoint, he was faced with two assailants, including Anderson, who raised their guns at him, and two women were in a nearby car within the line of fire of the assailants. Although Baker characterized his movements toward Anderson as a "chase," the evidence favorable to Baker paints a chaotic scene, one where Anderson might have appeared like he was going to run toward Baker but then "bolted off," and "started going in through a car."

There was evidence presented at trial that the shooting could have occurred in approximately five seconds. During this relatively short period of time, Baker fired 16 shots, 11 of which hit Anderson, and 7 of which traveled through Anderson's body from back to front. Baker also said he stopped shooting as soon as Anderson dropped to the ground and later expressed surprise that so many of his shots had hit Anderson.

Based on the foregoing evidence, whether Baker used a reasonable degree of force is a close call. We acknowledge that a reasonable jury *could* conclude that the degree of force used was not reasonable. But we cannot go so far as to say that "*no* reasonable juror could conclude that his use of force to defend himself was reasonable." *Glowacki*, 630 N.W.2d at 403 (concluding that defendant's use of force was unreasonable as a matter of law) (emphasis added). In fact, the very acknowledgment that this issue is a close call supports our conclusion that Baker presented sufficient evidence from which a reasonable jury could conclude that the degree of force used was reasonable. The reasonableness of the degree of force used in a particular situation is a quintessential question for a jury. *Id.* (stating that "[g]enerally, a reasonableness determination is properly made by the finder of

15

fact—in this case, the jury"). Accordingly, the jury should determine the reasonableness of Baker's force.

Because Baker met his burden of coming forward with evidence to support his claims of self-defense and defense of others, we hold that the district court abused its discretion by denying Baker's request for an instruction on these claims.

C.

Having concluded that the district court abused its discretion by failing to instruct the jury on self-defense and defense of others, we consider whether such error requires reversal and a new trial. Failure to instruct the jury on a defendant's defense when the evidence warrants it requires a new trial unless it can be said, "beyond a reasonable doubt that the error had no significant impact on the verdict." *State v. Pendleton*, 567 N.W.2d 265, 270 (Minn. 1997). Here, the district court's abuse of discretion in refusing to instruct the jury on self-defense and defense of others was reversible error. In *Johnson*, we concluded that the district court's refusal to provide self-defense instructions was reversible error because "[w]ithout the requested instructions, a jury following the law would have been required to return a guilty verdict even if it believed that Johnson was acting in . . . self-defense." 719 N.W.2d at 632. Likewise, without instructions on self-defense and defense of others, the jurors had to convict Baker of second-degree intentional murder even if they believed he was acting to defend himself or others when he shot and killed Anderson. Therefore, we conclude that the error was prejudicial, and Baker is entitled to a new trial.

**CONCLUSION**

For the foregoing reasons, we reverse the decision of the court of appeals and remand for a new trial.

Reversed and remanded.


GAÏTAS, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.